[No. E036597. Fourth Dist., Div. Two. May 10, 2006.]

JOSEPH DEVENY et al., Plaintiffs and Appellants, v.
ENTROPIN, INC., et al., Defendants and Respondents.

COUNSEL

Zimmerman Walker & Monitz, Scott L. Zimmerman and Ronald M. Monitz for Plaintiffs and Appellants.

Heller Ehrman, Robert B. Hubbell, Warrington S. Parker III and Paris A. Wynn for Defendants and Respondents.

OPINION

HOLLENHORST, J.—

## I.  INTRODUCTION

Plaintiffs and appellants Joseph Deveny et al. appeal from judgment following the trial court's granting of defendants' motion for summary judgment on the basis of the affirmative defense of the statute of limitations

in plaintiffs' class action alleging securities violations. Plaintiffs contend the trial court erred in applying the doctrine of inquiry notice and in ignoring plaintiffs' amended pleadings and related evidence under the "sham pleading" doctrine. Although we agree with the trial court's conclusion that inquiry notice rather than actual knowledge triggers the running of the applicable statute of limitations, we conclude that triable issues of material fact exist as to whether plaintiffs had constructive notice of the facts underlying their complaint. We therefore reverse.

## II.   FACTS AND PROCEDURAL BACKGROUND

Plaintiffs are a class of about 1,000 individuals who invested in securities issued by defendant Entropin, Inc.[1] (Entropin). During the class period (Aug. 1998 to Sept. 2002), Entropin was a pharmaceutical company whose sole business was to develop and market Esterom, a topical solution intended to treat impaired range of motion associated with shoulder and back injuries.

Entropin evaluated the safety and efficacy of Esterom in a series of clinical trials approved by the United States Food and Drug Administration (FDA).[2] In its August 19, 1998, SB-2 registration statement filed with the Securities and Exchange Commission (SEC) registering all of the outstanding shares of Entropin common stock, Entropin summarized the phase I and phase II findings as follows:

"Based on its clinical studies, the Company believes that Esterom® may involve a new and unique mechanism of action. The Phase I study demonstrated that the product does not cause detectable systemic effects including no effect on the cardiovascular system. During the Study, Esterom® caused no significant adverse events and was observed to be safe. The Company confirmed that in Phase I and Phase II trials, no anesthetic activity or vasoconstrictive activity was observed.

"Although the precise function of Esterom® is not known, the medicinal preparation is neither a local anesthetic nor analgesic. An anesthetic relieves pain at rest and pain with movement. An analgesic relieves major pain at rest

---

[1] Entropin's chairman of the board, Higgins D. Bailey, and president and chief executive officer, Thomas Tachovsky, are also named as individual defendants.

[2] Clinical trials are planned to demonstrate safety and efficacy required for Food and Drug Administration (FDA) approval. The FDA continually reviews clinical trial plans and results and may suggest design changes or may discontinue the trials if safety or other issues arise. Phase I clinical trials are conducted on healthy volunteers to determine the maximum tolerated dose, adverse events, and pharmacokinetics of a product. Phase II studies are conducted on a statistically relevant number of patients having a specific disease to determine initial efficacy in humans for that disease, and to identify possible adverse effects and safety risks. Phase III studies consist of wide-scale studies on patients with the disease for which the drug is intended and evaluate the overall risks and benefits of the drug.

and provides minor pain relief with movement. In comparison and according to patient evaluations, Esterom® provides minor relief of pain at rest and major relief of pain during movement."

On March 31, 1999, Entropin filed its form 10-K annual report for fiscal year 1998 with the SEC. The report stated, among other things, that the phase II clinical study had been completed and had shown that "[o]verall, Esterom® provided relief in both the back and shoulders which was sustained for seven days. There was no clinically observed local anesthetic or analgesic effect. The range of motion for each condition was improved significantly when compared with patients receiving a placebo."

In a series of press releases issued in May and June 1999, Entropin stated "[a] successful Phase II Clinical trial was completed showing both safety and efficacy in the treatment of acute lower back sprain, and acute painful shoulder." Entropin also stated that the results of the phase II study had been accepted by the FDA, which had allowed the company to begin the phase III clinical study. In press releases issued in August and November 1999, Entropin stated that the phase II study of Esterom had shown "high efficacy" in the treatment of acute lower back sprain and acute painful shoulder.

In December 1999, Entropin began a phase IIIA clinical trial for Esterom. A press release announcing the commencement of the phase IIIA clinical trial stated, "In placebo controlled phase II clinical trials, Esterom® solution demonstrated effectiveness in the improvement of range of motion (ROM) associated with impaired shoulder function and acute lower back sprain. Upon successful completion of the Phase III trials, a New Drug Application will be filed with the FDA."

On February 1, 2000, Entropin issued a press release announcing a planned public offering of stock. The release stated that "the ROM of patients suffering from shoulder and back conditions was improved significantly when compared with patients receiving a placebo. The Phase III trials for treatment of impaired ROM due to shoulder injuries and functionality started in December 1999. It is expected that the Phase III trials will be completed and a NDA filed with the FDA in 2001."

On March 15, 2000, Entropin sold shares of common stock and warrants to the public under a prospectus and registration statement filed with the SEC for gross proceeds of $16.6 million. The registration statement filed with the

FDA stated that the phase I and II clinical trials had shown that Esterom was well tolerated at the dose used and the range of motion of patients was improved significantly as compared to patients receiving a placebo.

Throughout 2000 and 2001, Entropin issued press releases concerning the progress of the phase IIIA clinical trial. The press releases described Esterom as having "quick efficacy on shoulder and back problems," and as having the demonstrated ability "to rapidly restore range of motion." A press release issued in October 2000, stated that the results of the phase IIIA study "showed a positive dose response in treated patients" and "a trend toward efficacy in the study's primary endpoint at the 10% dose, although statistical significance was not achieved."

A press release issued in April 2001 stated that despite problems with the phase IIIA clinical trial, "the study still showed a clear efficiency trend in the high dose solution."

Press releases issued in February through June 2002 stated, "The prior Phase II study[] demonstrated that Esterom® provided statistically significant improvement for soft tissue afflictions for both the shoulders and the lower back."

In September 2002, however, Entropin issued a press release stating that its clinical trials had been a failure; Esterom was ineffective; and Entropin was abandoning the drug and any phase III trials. Thereafter, the market price of Entropin securities collapsed.

On January 28, 2003, plaintiffs filed a complaint in a securities fraud class action alleging that defendants fraudulently concealed from plaintiff investors negative clinical data that revealed that Esterom, a drug under development, was ineffective. Plaintiffs' first cause of action alleged that defendants had violated Corporations Code sections 25401, 25403, and 25501, and their second cause of action alleged that defendants had violated section 11 of the Securities Act of 1933.

Plaintiffs alleged that they purchased shares in reliance on Entropin's positive representations concerning the outcome of clinical trials. Specifically, plaintiffs alleged that defendants misrepresented in the private placement memorandum and in the March 14, 2000, registration statement that Esterom demonstrated statistically significant improvement for patients as compared to a placebo in the phase II clinical trials. Defendants allegedly failed to disclose to potential investors that the statistical analysis of the phase II study did not conform to acceptable statistical practice or that the phase II study was knowingly defective and would have to be repeated. Defendants allegedly

failed to disclose that Entropin had not performed pharmacokinetics tests (PK tests) essential for determining how Esterom is absorbed, metabolized, and excreted by the body, even though the FDA had repeatedly requested such tests, and defendant could not develop Esterom as a commercially viable product without such tests. Defendants allegedly misrepresented that Entropin would file a new drug application (NDA) with the FDA in 2001, when in fact Entropin could not file an NDA without first performing the PK tests, which did not take place until mid-2002. Defendants allegedly misrepresented repeatedly that the phase II study had shown that Esterom was effective and that Entropin was close to achieving FDA approval of the product.

On September 9, 2002, Entropin issued a press release admitting that the phase II and III clinical trials of Esterom had been a failure, that Esterom was clinically ineffective, and Entropin's board of directors had decided to forgo further development of the product. The market price of Entropin securities collapsed following the announcement.

Plaintiffs alleged that the September 9 announcement was the first indication that defendants had misled them about the efficacy of Esterom, the progress of the clinical trials, and the prospects for FDA approval of Esterom and its commercial potential. Defendants generally denied the allegations of the complaint.

In July 2003, defendants moved for summary judgment on the ground of the statute of limitations. However, in October 2003, plaintiffs moved to file a first amended complaint. Defendants did not oppose the motion, and plaintiffs filed their first amended complaint on December 17, 2003. The first amended complaint alleged claims under Corporations Code sections 25400, 25403, 25500, 25401, 25501, 25504, and 25504.1, and under sections 11 and 12(a) of the Securities Act of 1933. Defendants generally denied the allegations of the first amended complaint.

Defendants filed a motion for summary judgment with respect to the first amended complaint on February 5, 2004; the basis for the motion was that plaintiffs' claims were barred by the applicable statutes of limitation. Defendants' separate statement of undisputed material facts filed in support of the motion listed only 16 purportedly undisputed material facts, including the following: Before 1999, Entropin had distributed an abstract to potential investors regarding the results of Esterom's phase II testing, which disclosed that Esterom was detected in the urine of 17.24 percent of clinical trial participants, but was not detected in their blood. In December 1999, the report of the phase II clinical trial was posted on Entropin's Web site; that report, in a column entitled "Summary of Findings," stated in bullet-point

fashion, "No drug detected in blood" and "17.24% of subjects tested positive for drug in urine." The report remained posted on Entropin's Web site at least until June 14, 2001.

Defendants' separate statement of undisputed facts further stated that Entropin, in an October 2, 2000, press release, "expressly invited those in the public seeking information about Esterom to '. . . visit [Entropin's] website at www.entropin.com[,]' " where the above described report was available. In addition, Entropin's December 23, 1999, and March 9, 2000, registration statements explicitly disclosed to investors the uniform resource locator (URL) of Entropin's Web site, and an October 2, 2000, press release invited investors to visit the Web site.

Plaintiffs moved for leave to file a second amended complaint on April 21, 2004. The trial court granted the motion on May 27, 2004.

On May 27, 2004, plaintiffs filed an opposition to defendants' motion for summary judgment. In the separate statement of material facts, plaintiffs contended that the blood and urine data set forth in the phase II report did not provide plaintiffs or other investors with any reason to believe that Esterom was not absorbed or was not effective. Plaintiffs stated that both Higgins Bailey and Thomas Tachovsky had each stated in their depositions that the phase II report indicated that Esterom was absorbed and was effective, and Bailey stated that the blood and urine data in the phase II report indicated encouraging results.

Plaintiffs' separate statement of material facts also stated that the FDA required Entropin to conduct pharmacokinetic studies on Esterom, but Entropin never conducted such studies, although it falsely told investors it was complying with FDA requirements for such studies and identified scientists who were assisting Entropin in carrying out such studies.

Plaintiffs' separate statement of material facts stated that they took Entropin's October 2, 2000, press release to mean what it stated in its title, i.e., that the results were encouraging. Plaintiffs stated that from 1997 to September 9, 2002, defendants represented to investors in press releases and shareholder letters, at shareholder meetings and in telephone conversations, that Esterom was effective, the clinical trials were on track, and an NDA would be filed shortly.

Plaintiffs further stated that none of them had actual notice of the blood and urine data until after November 2002, when their attorney initiated an investigation, and none of them had any knowledge or suspicion of defendants' wrongdoing or of potential claims against defendants before September

2002. They stated that an average investor would not have interpreted the phase II report as indicating that Esterom was not absorbed and was thus ineffective, and thus they could not be charged with inquiry notice or constructive notice of their claims.

On June 8, 2004, defendants filed a reply brief in support of the motion for summary judgment. At the hearing on the motion on June 10, 2004, the trial court granted the motion for summary judgment. The trial court's order granting the motion was filed on July 1, 2004. Judgment was entered on August 13, 2004.

## III. DISCUSSION

### A. *Request for Judicial Notice*

Plaintiffs have requested this court to take judicial notice of certain court records in the action entitled *In re Entropin, Inc. Securities Litigation*, case No. CV-04-06180 RSWL (CWx), pending in the United States District Court for the Central District of California. In particular, plaintiffs have requested us to take judicial notice that the defendants in that action, who are the same defendants in the current action, moved for summary judgment on the defense of the statute of limitations based on the same evidence offered in the current action. The court denied that motion, holding that "a material issue of fact exists concerning when plaintiffs had either actual or inquiry notice of facts constituting the alleged fraud upon which their claims are based."

This court may take judicial notice of court records outside the record on appeal, including unpublished orders and decisions in a related federal proceeding. (Evid. Code, §§ 459, subd. (a), 452, subd. (d); *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1089, fn. 4 [6 Cal.Rptr.3d 457, 79 P.3d 569]; *Forty-Niner Truck Plaza, Inc. v. Union Oil Co.* (1997) 58 Cal.App.4th 1261, 1277, fn. 7 [68 Cal.Rptr.2d 532].) However, a litigant must demonstrate that the matter as to which judicial notice is sought is both relevant to and helpful toward resolving the matters before this court. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [76 Cal.Rptr.2d 749, 958 P.2d 1062].) In reviewing the trial court's ruling on a motion for summary judgment, we conduct de novo review of the record, as discussed *post*. We therefore do not consider the ruling of another court on a related matter to be relevant to or helpful toward this task, and we deny the request for judicial notice.

### B. *Standard of Review*

After a motion for summary judgment has been granted, this court "examine[s] the record de novo and independently determine[s] whether [the]

decision is correct. [Citation.]" (*Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1149 [119 Cal.Rptr.2d 131].) In doing so, we use the same three-step process employed by the trial court. First, we identify the issues raised by the pleadings. Second, we determine whether the moving party's showing establishes facts sufficient to negate the opposing party's claims, and to justify judgment in the moving party's favor. If so, third, we determine whether the opposing party has raised a triable material issue of fact. (*Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 392 [134 Cal.Rptr.2d 689].)

"In reviewing an order granting summary judgment, . . . [t]he declarations of the party opposing summary judgment . . . are liberally construed to determine the existence of triable issues of fact. All doubts as to whether any material, triable, issues of fact exist are to be resolved in favor of the party opposing summary judgment." (*Cochran v. Cochran* (2001) 89 Cal.App.4th 283, 287 [106 Cal.Rptr.2d 899].)

Here, defendants sought summary judgment on the basis of the statute of limitations. "While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 [245 Cal.Rptr. 658, 751 P.2d 923].)

## C.  *Inquiry Notice*

The trial court held that defendants had established the statute of limitations defense because plaintiffs were on inquiry notice of the facts underlying their complaint more than a year before the complaint was filed. Plaintiffs contend that the trial court erred in holding that inquiry notice rather than actual notice applied to plaintiffs' claims.

### 1.  *State Claims*

■ Plaintiffs' complaint alleged claims under Corporations Code sections 25401, 25501, and 25504, among other claims. Those claims are governed by the statute of limitations in Corporations Code section 25506, which requires, in relevant part, that an action be brought before "the expiration of one year after the discovery by the plaintiff of the facts constituting the violation . . . ."

The parties agree that no published California case has yet addressed whether Corporations Code section 25506 requires actual notice or inquiry notice to trigger the running of the one-year statute of limitations, and our own research has not revealed any such case. Several federal courts, however,

have held that inquiry notice is sufficient to trigger the limitations period under section 25506. (*Kramas v. Security Gas & Oil, Inc.* (9th Cir. 1982) 672 F.2d 766, 770–771 [holding that the plaintiff should have been aware of alleged violations of securities laws more than one year before filing suit, and claims based on those violations were therefore time-barred]; *Rochambeau v. Brent Exploration, Inc.* (1978) 79 F.R.D. 381, 387 [plaintiff's claim that he discovered facts constituting violation within one year of filing suit created an issue of fact precluding summary judgment]; *Levine v. Diamanthuset, Inc.* (N.D.Cal. 1989) 722 F.Supp. 579, 589, reversed on other grounds (9th Cir. 1991) 950 F.2d 1478.)

Following these federal cases, the trial court held that inquiry notice had triggered the running of the statute of limitations more than one year before plaintiffs filed their complaint, and the complaint was therefore time-barred.

Plaintiffs note that Corporations Code section 25507, setting the statute of limitations for actions brought under section 25503, contains language identical to that of section 25506. Such an action must be brought within "one year after the discovery by the plaintiff of the facts constituting such violation . . . ." (Corp. Code, § 25507, subd. (a).) One California court has held that the statute of limitations under section 25507 does not begin to run until the plaintiff has actual knowledge of the facts that are the bases for the suit, and mere inquiry notice is not enough. (See *Eisenbaum v. Western Energy Resources, Inc.* (1990) 218 Cal.App.3d 314, 325–326 [267 Cal.Rptr. 5] (*Eisenbaum*).) Plaintiffs urge us to follow *Eisenbaum* rather than the federal cases applying section 25506.

■ The standards we employ in interpreting statutes of limitation are well established. "Our function, as with the construction of any statute, is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In the first instance, we look to the plain meaning of the statutory language. If further analysis is necessary, we apply a reasonable and commonsense interpretation, avoiding absurdity. [Citations.] We also consider the legislative purpose and public policy particularly relevant to statutes of limitation. In general, the legislative purpose behind such statutes is to prevent plaintiffs from asserting stale claims. At the same time, public policy favors the resolution of claims on the merits. Therefore, in ascertaining a limitations period, we must strike a balance 'between the public policy favoring extinction of stale claims and that favoring resolution of disputes on their merits.' [Citation.]" (*Debro v. Los Angeles Raiders* (2001) 92 Cal.App.4th 940, 949 [112 Cal.Rptr.2d 329] (*Debro*).)

The issue in *Debro, supra,* 92 Cal.App.4th 940, was the meaning of the word "discovery" in the context of Government Code section 12654,

subdivision (a), ("[a] civil action under Section 12652 may not be filed more than *three years after the date of discovery by the official of the state or political subdivision charged with responsibility to act* in the circumstances . . . ."). (*Debro, supra,* 92 Cal.App.4th at p. 948.) The court noted, "the term 'discovery' is not foreign to California's statutes of limitation. Long before the Legislature used that term in Government Code section 12654, it was used—and interpreted by California courts—in connection with the limitations period for causes of action based on common law fraud and mistake. (Code Civ. Proc., § 338, subd. (d).)" (*Id.* at p. 950.)

"Code of Civil Procedure section 338, subdivision (d), includes common law fraud among the causes of action that must be asserted within three years. Under that provision, the cause of action for fraud does not accrue—and thus the limitations period does not start to run—'until the discovery, by the aggrieved party, of the facts constituting the fraud.' (Code Civ. Proc., § 338, subd. (d).) The purpose of this provision is to promote the resolution of claims on the merits. Since fraud by its nature is often concealed from the victim, the provision protects fraud victims from having the limitations period run before they are even aware of the fraud. On the other hand, if the term 'discovery' were viewed too literally, requiring awareness of every fact necessary for a fraud claim, a plaintiff could unduly delay the commencement of litigation by asserting ignorance of the ultimate fact of fraud. Accordingly, we have long interpreted Code of Civil Procedure section 338 to commence upon the discovery by the aggrieved party of the fraud *or* facts that would lead a reasonably prudent person to *suspect* fraud." (*Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177].)

"We conclude it is appropriate to ascribe the same meaning to the term 'discovery' in the context of Government Code section 12654, subdivision (a). As with fraud claims under Code of Civil Procedure section 338, this interpretation balances the policy of avoiding stale lawsuits with the policy of providing a reasonable time for a plaintiff to discover a false claim. Furthermore, our interpretation is consistent with the tenets of Civil Code section 19, which reads: 'Every person who has actual notice of circumstances *sufficient to put a prudent man upon inquiry* as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact.' (Italics added.) Consequently, circumstances which put a reasonable person on inquiry of a false claim are constructive notice of the false claim itself." (*Debro, supra,* 92 Cal.App.4th at p. 950.)

The court in *Eisenbaum, supra,* 218 Cal.App.3d 314, held that actual notice was required to trigger the limitations period under Corporations Code section 25507 for two reasons. First, the case involved claims against a fiduciary. The court noted, "Where a fiduciary obligation is present, the

courts have recognized a postponement of the accrual of the cause of action until the beneficiary has knowledge or notice of the act constituting a breach of fidelity. [Citations.]" (*Eisenbaum, supra,* 218 Cal.App.3d at p. 324.) However, the court also based its ruling on the language of the statute. The court explained: "The critical focus here is found in the language of the section 25507, subdivision (a), which requires '*discovery . . . of the facts.*' (Italics added.) The statute requires Eisenbaum's *actual knowledge of the facts before the one-year statute commences to run* [fn. omitted]. By its plain language, the statute requires actual knowledge, not just 'inquiry notice.' This conclusion is buttressed by a comparison of the language of section 25506.1 which establishes a statute of limitations for fraud liability imposed upon certain persons who 'expertise' a prospectus. This latter section expressly mandates a one-year limitation 'after such discovery should have been made *by the exercise of reasonable diligence.*' (§ 25506.1, italics added.) Here *the statute of limitations requires the party wronged to have actual notice of the illegality before the one year begins to run. . . .*" (*Eisenbaum, supra,* 218 Cal.App.3d at pp. 325–326.) As the court recognized in *Grace Bros., Ltd. v. DNA Plant Technology Corp.* (9th Cir. 2000) 225 F.3d 662 (holding that under section 25506, "the clock starts running on the statute of limitations" when the plaintiff has inquiry notice of the alleged misconduct), the *Eisenbaum* court's discussion of inquiry notice was dicta. (*Grace Bros., Ltd. v. DNA Plant Technology Corp, supra,* 225 F.3d at p. 662, fn. 1.)

Plaintiffs argue that no rationale exists for treating the identical language of Corporations Code sections 25506 and 25507 differently because "[w]hen legislation has been judicially construed and a subsequent statute on a similar subject uses identical or substantially similar language, the usual presumption is that the Legislature intended the same construction . . . ." (*People v. Lopez* (2003) 31 Cal.4th 1051, 1060 [6 Cal.Rptr.3d 432, 79 P.3d 548].) Although we agree with this general statement of the law, we find it does not apply to the issue before us in the way plaintiffs request.

■ The principle stated in *People v. Lopez, supra,* 31 Cal.4th 1051, applies when the Legislature has enacted a *subsequent* statute using the same or substantially similar language. Corporations Code sections 25506 and 25507, however, were both enacted as part of the *same* legislation. (Stats. 1968, ch. 88, § 2, p. 282.) Both statutes, however, postdated other statutes of limitations that included the term "discovery" and that had been judicially construed as establishing an inquiry notice standard. (E.g., Code Civ. Proc., § 338, subd. (d); Pen. Code, §§ 801.5, 803, subd. (c).) As the court stated in *Debro, supra,* 92 Cal.App.4th at page 953, "Given the Legislature's presumed understanding of the judicial interpretation of the term 'discovery' in other statutes of limitation, it is reasonable to assume that it would have used a word other than 'discovery' if it intended for the limitations period to

commence only upon actual knowledge of a violation. [Citation.]" We conclude that inquiry notice is sufficient to trigger the running of the limitations period under section 25506.

### 2. *Federal Claims*

■ Plaintiffs' claims under the Securities Act of 1933 are governed by the statute of limitations set forth in title 15 United States Code section 77m: "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . [and] [i]n no event . . . more than three years . . . after the sale." That statute by its terms incorporates an inquiry notice standard.

### D. *Sham Pleading Doctrine*

#### 1. *Allegations in the Original and Amended Complaints*

Plaintiffs' original complaint alleged in paragraphs 94 and 96 that "[d]efendants withheld scientific and clinical knowledge that Esterom was not detected in the blood or urine of patients." and that "[w]hen Plaintiffs discovered that Entropin had omitted to disclose material information concerning the absorption of Esterom, Plaintiffs contacted counsel and began an investigation." Other paragraphs of the complaint contained similar statements.

Defendants argued that these allegations constituted binding admissions that, when connected to each other and the undisputed fact of the Web site abstract, established an absolute defense. In granting defendants' motion for summary judgment, the trial court ruled that plaintiffs' intent in filing their first amended complaint was to avoid defendants' earlier summary judgment motion by omitting harmful material allegations. The trial court therefore considered the allegations of the original complaint in ruling on the motion for summary judgment.

Plaintiffs now contend that the trial court erred in applying the sham pleading doctrine for two reasons. Plaintiffs claim that those allegations were the result of incomplete information at the inception of their lawsuit and were inartful conclusions of their attorney, as to which their attorney later provided a satisfactory explanation. Plaintiffs also claim that the allegations of the original complaint were ambiguous and inconclusive, and the trial court erred in treating them as binding admissions. Because, as we discuss *post*, we find plaintiffs' first argument persuasive, we need not address the second argument that the original pleading was ambiguous.

## 2. *Declaration in Support of Amended Complaint*

Plaintiffs' attorney, Laurence Rosen, provided a declaration in support of the amended complaint explaining the allegations of the original complaint and the reasons for the amendment.

Specifically, Rosen's declaration stated:

"6. Ever since the filing of the Original Complaint in connection with the above-referenced matter on January 17, 2003, I have maintained an ongoing investigation of the facts and circumstances of this case, in order to better comprehend the volume and complexity of the issues involved.

"7. Understanding this case entailed highly technical inquiries into the nature and structure of the drug Esterom, the methodology of the preclinical and clinical trials, the validity of the ways in which the conclusions were drawn regarding the clinical trials, the statistical significance of the findings, the problems associated with the Phase IIIA and Phase II/III trials, and other matters. I was able to gather much of the needed information through the careful review of documents produced in discovery as well as through interviews of third parties and working closely with an expert on drug development and commercialization.

"8. From my investigation, I have come to the realization that certain facts and allegations contained in the Original Complaint would need to be supplemented and clarified with additional facts and supporting bases, such that the Plaintiff Class may properly present the full gamut of their claims."

Rosen stated that his investigation had revealed, among other things, that defendants had failed to conduct PK tests, in contravention of FDA instructions, and that defendants' claims in their reports of the results of phase II trials were false and misleading. Moreover, Rosen had learned that the phase III trials had "suffered from a series of setbacks such that Defendants knew that the study results might be seriously compromised [and] . . . the Phase IIIA study would likely not be able to serve as one of the two adequate and well controlled studies needed to support a new drug application." In addition, Rosen stated that he had learned that "defendants misrepresented the current stage of development of Esterom." The amended complaint incorporated this new information as the basis for the claims.

Both the original complaint and the amended complaints alleged that plaintiffs were completely unaware of defendants' wrongdoing during the entire "Class Period from August 21, 1998 through September 9, 2002," and that they "diligently filed this complaint less than one year after discovery of defendants' violations."

Moreover, in response to defendants' motion for summary judgment, Rosen provided an additional declaration. Rosen stated that he was first contacted by an investor in November 2002. In December 2002, Rosen discovered through his investigation "that only about 18% of test subjects tested positive for Esterom in their blood and urine in the Phase II clinical trials." The source of his information was "an individual with personal knowledge of the Phase II clinical trial." He stated that he "initially believed this fact was evidence that Entropin management knew that Esterom was not absorbed," and he therefore included paragraphs 94 and 96 in the complaint to establish defendants' scienter. (Italics omitted.)

Rosen stated that after filing the original complaint in January 2003, he engaged a drug development expert. The expert reviewed the Web site abstract and advised Rosen that the blood and urine data were inconclusive. Rosen accordingly moved to amend the complaint to include broader allegations in place of the original language. The amended complaint stated, "Defendants withheld facts evidencing that their claims of Esterom's efficacy in the Phase II trials was misleading," and added a list of specific wrongful acts and omissions, including the fact that defendants had withheld the "significance of and precise details" concerning the blood and urine data.

### 3. *The Sham Pleading Doctrine*

Under the sham pleading doctrine, plaintiffs are precluded from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers or motions for summary judgment. (See *Hendy v. Losse* (1991) 54 Cal.3d 723, 742–743 [1 Cal.Rptr.2d 543, 819 P.2d 1] [affirming an order sustaining defendants' demurrer without leave to amend when the plaintiff filed an amended complaint omitting harmful allegations from the original unverified complaint]; see also *Colapinto v. County of Riverside* (1991) 230 Cal.App.3d 147, 151 [281 Cal.Rptr. 191] (*Colapinto*) ["If a party files an amended complaint and attempts to avoid the defects of the original complaint by either omitting facts which made the previous complaint defective or by adding facts inconsistent with those of previous pleadings, the court may take judicial notice of prior pleadings and may disregard any inconsistent allegations."].)[3] A noted commentator has explained, "Allegations in the original pleading that rendered it

[3] The court in *Colapinto, supra*, 230 Cal.App.3d 147, on which defendants primarily rely, did not expressly state that application of the sham pleading rule requires that the plaintiff has failed to provide an explanation for amending allegations. However, the authorities on which *Colapinto* relied explicitly include that requirement. (*Id.* at pp. 151–152; see *Amid v. Hawthorne Community Medical Group, Inc.* (1989) 212 Cal.App.3d 1383, 1390–1391 [261 Cal.Rptr. 240] ["Here, . . . no explanation for this pleading inconsistency having been offered, the trial court was entitled to conclude that appellant's breach of contract cause of action was a sham."];

vulnerable to demurrer or other attack cannot simply be omitted without explanation in the amended pleading. The policy against sham pleadings requires the pleader to *explain* satisfactorily any such omission." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2005) ¶ 6.708, p. 6-142.1.)

Thus, superseded pleadings may be used at trial as admissions against interest; however, the party who made the pleadings must be allowed to explain the changes. (See *City of Pleasant Hill v. First Baptist Church* (1969) 1 Cal.App.3d 384, 418–419 [82 Cal.Rptr. 1].) This general rule usually precludes summary judgment that relies on a superseded pleading. (See *Kirby v. Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059 [14 Cal.Rptr.2d 604]; see also *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1058 [272 Cal.Rptr. 250] ["[A]n unexplained suppression of the original destructive allegation will not, in the words of Lady MacBeth, wash out the 'damned spot.' "].) The sham pleading doctrine is not " 'intended to prevent honest complainants from correcting erroneous allegations . . . or to prevent correction of ambiguous facts.' " (5 Witkin, Cal. Procedure (4th ed. 1997) Amendment of Pleadings § 1122, pp. 577–578.) Instead, it is intended to enable courts " 'to prevent an abuse of process.' " (*Amid v. Hawthorne Community Medical Group, Inc., supra,* 212 Cal.App.3d at pp. 1390–1391.)

### 4. *The Sham Pleading Doctrine Does Not Apply*

Here, the sham pleading doctrine does not apply because Rosen offered a plausible explanation for the amendment, i.e., that he had erred in relying on the failure to disclose the blood and urine data as the basis for the complaint because further discovery and consultation with experts had shown that such data was inconclusive. Even Entropin's chairman and former chief executive officer, Higgins Bailey, testified in a deposition that he "drew no conclusions" from the data showing that Esterom was not detected in the blood or urine of the clinical subjects. Moreover, the thrust of both the original and amended pleadings was that defendants' wrongful conduct was intended to promote the sale of Entropin's securities, and that such conduct continued until September 2002. The complaint was not based solely on the concealment of the blood and urine data, but also included allegations that, among other things,

*Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 384 [243 Cal.Rptr. 627] ["[T]he policy against sham pleading permits the court to take judicial notice of the prior pleadings and requires that the pleader explain the inconsistency. If he fails to do so the court may disregard the inconsistent allegations and read into the amended complaint the allegations of the superseded complaint"].)

We did not intend, in *Colapinto v. County of Riverside, supra,* 230 Cal.App.3d 147, to modify this well-established principle of law without any discussion; indeed, the opinion suggests implicitly that the plaintiff filed an amended complaint without explanation for the amended allegations.

(1) defendants had misrepresented that Esterom demonstrated statistically significant improvement for patients as compared to a placebo in the phase II clinical trials; (2) defendants failed to disclose to potential investors that the statistical analysis of the phase II study did not conform to acceptable statistical practice or that the phase II study was knowingly defective and would have to be repeated; (3) defendants failed to disclose that Entropin had not performed the PK tests essential for determining how Esterom is absorbed, metabolized, and excreted by the body, even though the FDA had repeatedly requested such tests, and defendant could not develop Esterom as a commercially viable product without such tests; (4) defendants misrepresented that Entropin would file an NDA with the FDA in 2001, when in fact Entropin could not file an NDA without first performing the PK tests, which did not take place until mid-2002; and (5) defendants misrepresented repeatedly that the phase II study had shown that Esterom was effective and that Entropin was close to achieving FDA approval of the product. In summary, plaintiffs alleged that defendants fraudulently sold securities although they knew or should have known that Entropin would never complete the phase III trials or obtain FDA approval to market Esterom.

In *Kirby v. Albert D. Seeno Construction Co., supra,* 11 Cal.App.4th 1059, the court stated, " '[S]ummary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence.' [Citation.] . . . [¶] [Defendant] asks us to give conclusive effect to an ambiguous statement in an unverified complaint and to ignore the explanation of the statement contained in deposition testimony taken under oath. . . . When the facts submitted in opposition to a summary judgment motion indicate the existence of a material factual issue, summary judgment should not be entered based on mistaken legal conclusions in the complaint. [Citation.] Summary judgment is also inappropriate where the opposing party submits evidence indicating that a mistake was made. [Citation.]" (*Id.* at pp. 1066–1067.)

Here, plaintiffs have provided sufficient evidence to demonstrate that a mistake was made in drafting the original pleading. We therefore conclude that the trial court erred in disregarding the allegations of the amended complaint and granting summary judgment on the basis of the sham pleading doctrine.

E. *Web Site Posting as Basis for Inquiry Notice*

The trial court ruled that Entropin's disclosure of the blood and urine data on its Web site in 1999 was sufficient to put plaintiffs on inquiry notice of their claims against defendants, and the statute of limitations therefore began to run more than two years before plaintiffs filed their original complaint.

■ Inquiry notice arises in a securities action when circumstances suggest to an investor of ordinary intelligence the possibility that he has been defrauded. (*Dodds v. Cigna Securities, Inc.* (2d Cir. 1993) 12 F.3d 346, 350.) In the vernacular of the securities laws, "[s]uch circumstances are often analogized to 'storm warnings.' " (*Ibid.*, citing *Cook v. Avien, Inc.* (1st Cir. 1978) 573 F.2d 685, 697.) Storm warnings may be found whenever there are " 'any financial, legal, or other data, such as public disclosures in the media about the financial condition of the corporation' " that would tend to alert a reasonable person to the likelihood of fraud. (*In re Infonet Services Corp. Securities Litigation* (C.D.Cal. 2003) 310 F.Supp.2d 1106, 1113–1114.)

■ "Inquiry notice—often called 'storm warnings' in the securities context—gives rise to a duty of inquiry 'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.' [Citations.] In such circumstances, the imputation of knowledge will be timed in one of two ways: (i) '[i]f the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose'; and (ii) if some inquiry is made, 'we will impute knowledge of what an investor in the exercise of reasonable diligence[] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.' [Citation.]" (*Lentell v. Merrill Lynch & Co., Inc.* (2d Cir. 2005) 396 F.3d 161, 168.) Thus, once placed on inquiry notice by storm warnings, an investor must perform a reasonable investigation into the possibility of fraud. (*Bamberg v. SG Cowen* (D.Mass. 2002) 236 F.Supp.2d 79, 85.) An investor who fails to fulfill this duty of inquiry will be charged with the knowledge of what an investor in the exercise of reasonable diligence would have discovered concerning the fraud, and this knowledge is imputed as of the date a diligent investigation would have turned up evidence sufficient to establish a cause of action. (*Berry v. Valence Technology, Inc.* (9th Cir. 1999) 175 F.3d 699, 704, 706 & fn. 9.)

■ The Ninth Circuit "generally views the question of when a reasonably diligent investor should have discovered a claim as one appropriate for the factfinder to determine after trial rather than one for a judge to decide as a matter of law on summary judgment." (*Luksch v. Latham* (N.D.Cal. 1987) 675 F.Supp. 1198, 1201); see also *Mosesian v. Peat, Marwick, Mitchell & Co.* (9th Cir. 1984) 727 F.2d 873, 879 ["The question of what a reasonably prudent investor should have known is particularly suited to a jury determination"].) Courts in other circuits have stated similar views. (See, e.g., *Young v. Lepone* (1st Cir. 2002) 305 F.3d 1, 8–9 [whether "storm warnings" were sufficient to place an investor on inquiry notice should be determined as a matter of law only when the underlying facts are either admitted or undisputed]; *In re Lupron Marketing and Sales Practices Lit.* (D.Mass. 2003)

295 F.Supp.2d 148, 183 ["Whether a plaintiff knew or should have known of an injury so as to trigger the running of a statute of limitations is, with rare exception, a jury issue."].)

■ "The defendants bear the initial burden of showing the existence of storm warnings. [Citation.] Once the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable diligence, but were unable to discover their injuries. [Citation.] If the plaintiffs' duty to exercise due diligence is triggered, the plaintiffs ' "are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period." ' [Citations.]" (*In re Exxon Mobil Corp. Securities Litigation* (D.N.J. 2005) 387 F.Supp.2d 407, 417.)

California law takes a very similar view of the requirement of reasonable diligence, (see, e.g., *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 440 [159 P.2d 958] ["when the facts are susceptible to opposing inferences, whether 'a party has notice of "circumstances sufficient to put a prudent man upon inquiry as to a particular fact," and whether "by prosecuting such inquiry, he might have learned such fact" (Civ. Code, § 19), are themselves questions of fact to be determined by the jury or the trial court' "]), and California courts similarly view determination of the issue as a question of fact usually to be decided by the trier of fact. (See, e.g., *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 833 [195 Cal.Rptr. 421] [" '[W]hether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide.' "].)

Here, the trial court ruled in effect that posting information on the company's Web site and referring potential investors to that Web site for general information was sufficient, as a matter of law, to establish inquiry notice.

Whether merely referring investors to a company Web site for general information is sufficient to establish inquiry notice as a matter of law as to all information available on that Web site is a question of first impression in this state. Indeed, our research revealed only one federal case that addressed a similar contention, and that case concluded that issues of fact precluded summary judgment on the issue of notice. (*Medimatch, Inc. v. Lucent Technologies Inc.* (N.D.Cal. 2000) 120 F.Supp.2d 842 (*Medimatch*).)

In *Medimatch, supra,* 120 F.Supp.2d 842, the defendant sold telephone equipment to the plaintiff but failed to disclose that the equipment was not "Y2K-compliant." The plaintiff sued for consumer fraud, among other claims, and the defendant filed a motion for summary judgment on the ground of the

statute of limitations. The defendant argued that it had disclosed the "Y2K" defects on their Web site, and the plaintiff was therefore on inquiry notice. (*Id.* at p. 853.) The court rejected the argument. The court noted that the statute of limitations "becomes a mixed question of law and fact when resolution requires determining constructive notice." (*Id.* at p. 853, fn. 7.) The court held, "[E]ven assuming a detailed early posting of the Y2K defects, the Court cannot say as a matter of law that plaintiffs should have discovered the information on the web site through the exercise of reasonable diligence. . . . [T]hese plaintiffs are not in the technology field and had no reason to be checking the web sites of the manufacturers of their office equipment. . . . At this stage of the proceedings, the Court is unable to find, as a matter of law, that plaintiffs should have been aware that their telephone equipment may have contained Y2K defects earlier than the dates upon which they were notified by Lucent." (*Id.* at p. 853.) The court specifically rejected the argument that a "web site posting was tantamount to the traditional practice of national publication through the print media." (*Id.* at p. 853, fn. 6.)

We believe that *Medimatch, supra,* 120 F.Supp.2d 842, was correctly decided, and its reasoning and conclusion are persuasive. The fact is that information on a Web site may exist in practical obscurity rather than provide notice to the public. Here, the motion for summary judgment did not establish any facts about whether plaintiff investors were particularly sophisticated, whether they had access to the Internet, how prominently the critical information was displayed on the Web site, or the ease of navigation on the Web site. Moreover, defendants consistently provided public information in the form of press releases and SEC filings that gave a rosy and encouraging picture of the prospects for Esterom.

We conclude that under these circumstances, posting information on the company's Web site concerning ambiguous scientific data and referring investors to that Web site for general information was not, as a matter of law, sufficient to put investors on inquiry notice in the absence of a showing that the investors actually saw that information. Rather, an issue of material fact exists that precludes summary judgment on the issue. And a rule that allows a company to provide notice simply by posting information to a Web site, in the absence of a more compelling showing than exists in the present circumstances, could foster the practical concealment of damaging information.

F.  *October 2000 Press Release as a "Storm Warning" of Fraud That Put Plaintiffs on Inquiry Notice*

Defendants' motion for summary judgment in the trial court was brought exclusively on the ground that plaintiffs' claims were based on the allegation

that defendants had failed to disclose the blood and urine data, but plaintiffs "were on inquiry notice of the allegedly concealed blood and urine data as early as December 1999" because that data was made available on Entropin's Web site, which was referred to in various SEC filings and press releases.

On appeal, however, defendants contend that a press release[4] they issued on October 2, 2000, announcing the "encouraging" results of the phase IIIA trial was a "storm warning" of fraud that put plaintiffs on inquiry notice when combined with the subsequent drop in the price of the securities.

Defendants' separate statement of undisputed material facts filed in support of their motion for summary judgment mentioned the October 2000 press release in three separate paragraphs:

"9. [I]n an October 2, 2000 press release, Esterom expressly invited those in the public seeking information about Esterom to '. . . visit [its] website at www.entropin.com[,]' where the Phase II Report, which contained the following explicit disclosures, 'No drug detected in blood' and '17.24% of subjects tested positive for drug in urine[,][']' was available. [¶] . . . [¶]

"12. In an October 2, 2000 press release, Entropin expressly invited investors seeking additional information regarding Esterom to '. . . please contact Dr. Higgins Bailey, chairman, or Patricia Kriss, chief financial officer at (760) 775-8333 or visit our web site at www.entropin.com. [¶] . . . [¶]

"15. Plaintiffs admit to having read and relied upon Entropin's October 2, 2000, press release which invited the public view [sic] Entropin's website,

---

[4] The press release stated:
"ESTEROM® SOLUTION DEMONSTRATES ENCOURAGING RESULTS IN PRELIMINARY ANALYSIS OF PHASE IIIA STUDY.
"Entropin, Inc. . . . today announced *encouraging results* from a preliminary analysis of a double-blinded, placebo-controlled Phase IIIA study of its topical investigational treatment for impaired range of motion, called Esterom® solution. Data from the study showed no significant adverse events. Minor treatment-emergent side-effects (headache, body pain and skin rash) were few and equally associated with the placebo and treatment groups. Results of the study, which investigated 5% and 10% concentrations of Esterom® versus placebo in 362 patients with impaired shoulder function, showed a positive dose response in treated patients. Data from the study also showed a *trend toward efficacy* in the study's primary endpoint at the 10% dose, although statistical significance was not achieved (p=0.14)." (Italics added.)
The press release suggested that the "failure to achieve significance at the desired level of statistical significance may be due to deficiencies in the protocol design and/or investigator training."
The report quoted Entropin's president as follows: "We are encouraged by the preliminary analysis from this study, which was intended to provide further information for refining the design of our upcoming Phase IIIB trial of Esterom® as well as to confirm the safety of this treatment, . . . Based on these initial results, we remain on track to begin our next pivotal study in Q1 2001, which we expect will support the filing of a New Drug Application (NDA)."

where the Phase II Report, which contained the following explicit disclosures: 'No drug detected in blood' and '17.24 % of subjects tested positive for drug in urine[,'] was available."

The documentary evidence defendants proffered in support of these statements consisted solely of the October 2, 2000, press release itself and paragraph 61 of the original complaint.

In their opposing separate statement of material facts, plaintiffs did not dispute the allegations of paragraphs 9 and 12. With respect to paragraph 15, plaintiffs stated: "Disputed. The supporting evidence cited by Defendants does not support such a statement of fact. P61 of the Complaint does not state that Plaintiffs read the Oct. 2, 2000[,] press release. The Complaint at P100 simply states that 'Plaintiffs and members of the Class *reasonably relied* on the misstatements and omissions of the Defendants as set forth above.' Nowhere does the Complaint refer to the Entropin website or to the Phase II Report. Each of the class representatives testified that they had not seen the Phase II Report previously. [¶] . . . [¶] In addition, Defendants are unable to identify one single person (not employed by Entropin) that has ever accessed the Phase II Report on the Entropin website." (Fn. omitted.)

In their reply brief in support of the motion for summary judgment, defendants argued for the first time that Entropin stock dropped in price after the October 2, 2000, press release, and that fact constituted a "storm warning" that required plaintiffs to investigate the possibility of fraud. The fact that Entropin stock dropped in price following the October 2, 2000, press release was not mentioned in defendants' separate statement of material facts, and the trial court did not mention the October 2, 2000, press release in its order granting the motion for summary judgment.

■ Every motion for summary judgment should be accompanied by a separate statement setting forth plainly and concisely all the material facts that the moving party contends are undisputed. This court has stated, "One of the purposes of the separate statement requirement is to inform the opposing party of what issues and undisputed material facts they must address in order to defeat the motion. [Citation.]" (*Elcome v. Chin* (2003) 110 Cal.App.4th 310, 322 [1 Cal.Rptr.3d 631].) Similarly, in *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [125 Cal.Rptr.2d 499], the court explained, " 'The due process aspect of the separate statement requirement is self evident—to inform the opposing party of the evidence to be disputed to defeat the motion.' [Citation.] [¶] Where a remedy as drastic as summary judgment is involved, due process requires a party be fully advised of the issues to be addressed and be given adequate notice of what facts it must rebut in order to prevail."

Although we may affirm a ruling on a ground not adopted by the trial court, we decline to do so when, as in the present case, the alternative ground presents fact issues that the opposing party and trial court did not have an opportunity to address. (See *Erickson v. Aetna Health Plans of California, Inc.* (1999) 71 Cal.App.4th 646, 653 [84 Cal.Rptr.2d 76].)

## IV. DISPOSITION

The judgment is reversed.

Ramirez, P. J., and McKinster, J., concurred.