[No. B188720. Second Dist., Div. Five. Apr. 5, 2007.]

STATE OF CALIFORNIA ex rel. JOHN METZ, Plaintiff and Appellant, v. CCC INFORMATION SERVICES, INC., Defendant and Respondent.

**COUNSEL**

Anderson Kill & Olick, Alex D. Hardiman, Edward J. Stein; and Scott C. Turner for Plaintiff and Appellant.

Latham & Watkins, Patrick E. Gibbs, Randall T. Kim and Brian D. Berry for Defendant and Respondent.

**OPINION**

**KRIEGLER, J.**—This appeal arises out of a qui tam action filed by plaintiff and appellant John Metz on behalf of the State of California, alleging defendant and respondent CCC Information Services, Inc., violated Insurance Code section 1871.7[1] by making false or misleading statements in connection with the settlement of Metz's 1999 automobile insurance claim under a policy issued by Farmers Insurance Company, following an accident in which Metz's 1992 Mitsubishi Galant suffered a total loss. As more fully explained below, the statements at issue consisted of the "comparable automobile" valuations CCC provided to Farmers in the claim settlement process—valuations Metz contends were made in violation of applicable regulations and designed to induce a fraudulently low insurance settlement, one that failed to adequately compensate for a total loss.

---

[1] All further statutory references are to the Insurance Code unless otherwise indicated.

The trial court entered judgment in favor of CCC after sustaining a demurrer to Metz's first amended complaint without leave to amend, finding the action barred by the applicable three-year statute of limitations and, alternatively, by section 1871.7, subdivision (e)(5)'s requirement that only the district attorney or Insurance Commissioner may bring a related action based on the facts underlying a pending action. The trial court found that before Metz filed the underlying action against CCC, he had filed a prior qui tam action based on the same underlying facts against Farmers and others (the Farmers action),[2] not including CCC, which was pending at the time of the demurrer.

■ Metz argues the trial court erred in sustaining the demurrer because he filed the complaint within three years of acquiring actual knowledge of all CCC's actionable conduct, and he alleged actionable statements by CCC made less than three years before filing the original complaint. Metz also argues his allegation of an ongoing conspiracy sufficed to defer the running of the statute of limitations. As to the trial court's alternative ground, Metz contends section 1871.7, subdivision (e)(5) does not bar the instant action because CCC was not a party to the Farmers action, and the instant action includes distinct allegations concerning CCC that were not part of the Farmers action. We hold that Metz's first amended complaint was time-barred by section 1871.7's limitations period and its proscription against the filing of related actions by any person other than the district attorney or Insurance Commissioner.[3] Accordingly, the judgment is affirmed.

## PROCEDURAL HISTORY

Metz, as a qui tam relator on behalf of the State of California, filed the Farmers action on July 24, 2002, in Los Angeles Superior Court, alleging Farmers and various related entities, along with two entities that provided Farmers with total loss valuations—Creative Automotive Consultants and B.I.D. Enterprises, Inc.—violated section 1871.7 by making false and misleading statements in connection with Metz's insurance claim for the 1999 total loss of his Galant.[4] As in the instant action against CCC, Metz's sole cause of action against Farmers was under section 1871.7, based on the

---

[2] *State of California ex rel. John Metz v. Farmers Group, Inc.* (Super. Ct. L.A. County, 2006, No. BC278259).

[3] As such, we do not reach CCC's contention that Metz's action was improper under the reasoning of our decision in *State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442 [44 Cal.Rptr.3d 491] (§ 1871.7 was not designed to prohibit fraud on the part of insurer, but rather to prohibit submission of fraudulent claims to insurers).

[4] For the definitions of "qui tam action" and "relator," along with a discussion of the general purpose and legislative background of section 1871.7, see *People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538, 545–552 [132 Cal.Rptr.2d 165].

manner in which Farmers reached its total loss valuation for Metz's car: Metz alleged Farmers relied on false or misleading statements in the valuations provided by Creative Automotive Consultants, B.I.D. Enterprises, *and CCC* that were intended to unfairly reduce the claim value of the insured's loss. As noted, CCC was not named as a defendant in the Farmers action. On December 3, 2003, the trial court in the Farmers action found, among other things, that Metz stated a claim for relief under section 1871.7, but struck Metz's prayer for civil penalties. On March 10, 2004, the same court overruled a demurrer by the Farmers entities, but granted in part those defendants' motion to strike portions of the second amended complaint.

On April 29, 2004, while the Farmers action was pending in Los Angeles Superior Court, Metz filed the original complaint against CCC in Alameda County. He filed the first amended complaint on November 4, 2004.[5] On March 29, 2005, CCC's unopposed motion to transfer the CCC action to Los Angeles was granted, and the matter was assigned to the same judge who was presiding over the Farmers action.

CCC demurred to the first amended complaint and requested judicial notice of various pleadings and orders from the Farmers action, including Metz's second amended complaint, filed December 16, 2003. The trial court, having granted both parties' motions for judicial notice, granted CCC's demurrer on alternative grounds. It found the action time-barred because the second amended complaint "conclusively shows that, by January 5, 2000, Mr. Metz had discovered facts to support his claim that CCC had provided a valuation 'based on false information.' Mr. Metz'[s] CCC complaint was filed more than three years after this discovery and must be dismissed." The trial court also found as an alternative basis for its ruling that Metz's action against CCC was "based on the same facts underlying the Farmers action," which had been previously filed and was pending. As a result, the action against CCC was barred by section 1871.7, subdivision (e)(5)'s requirement that only the district attorney or Insurance Commissioner may bring a related action based on the facts underlying a pending action.

## ALLEGATIONS IN THE RELEVANT PLEADINGS

In the sole cause of action of the first amended complaint in the CCC action, Metz alleged CCC violated section 1871.7, subdivision (b) by provid-

---

[5] The trial court erroneously found the CCC complaint had been filed on November 4, 2004, rather than on April 29, 2004, as CCC concedes was the actual filing date. As we explain, that error does not affect the judgment.

ing Farmers with a false and misleading valuation of Metz's 1992 Galant. More specifically, Metz alleged CCC used arbitrary and illegal criteria to improperly diminish the value for a replacement vehicle to compensate Metz for the total loss of his car under the Farmers policy. CCC concealed its improper valuation methodology and made misleading statements designed to induce him to settle for an amount below the full value of his insurance entitlement. Metz sought civil penalties for each of CCC's improper actions and an injunction to prevent it from engaging in such conduct in the future.

Metz further alleged he is a longtime consumer advocate in insurance-related matters. In 1996, he purchased an insurance policy from Farmers for his Galant. On October 4, 1999, within the period covered by that policy, Metz made a claim to Farmers for damages to his car. A Farmers representative informed Metz on December 29, 1999, that his claim would be sent to CCC for a price valuation. The next day, the Farmers representative told Metz that CCC made a $4,028 total loss valuation of Metz's car. In his CCC pleading, however, he included no factual allegations concerning the events of 2000. Instead, Metz made allegations concerning his investigation of CCC's valuation in 2001, during which time CCC made several statements concerning the manner in which it had reached its 1999 valuation of Metz's Galant. In May 2001, Metz requested CCC provide him with copies of the documents made in connection with its 1999 valuation. Metz spoke to a CCC representative on June 19, 2001, who arranged for Metz to receive such documents. Upon review, Metz found that CCC had discovered that the Galant had suffered a prior accident, but the documentation did not indicate that CCC investigated whether any of the comparable vehicles it used for its valuation had suffered accidents.

On July 3, 2001, another CCC representative provided Metz with additional documentation for its valuation. None of those documents reflected that CCC's investigation of the comparable vehicles included prior damage histories or mechanical evaluations. Two days later, the CCC representative told Metz that it used a "take price" in computing its valuations, whereby the car dealership with the comparable vehicle agreed to supply CCC with a formula to discount the vehicle's sticker price to reflect the price at which the car would actually be sold. When Metz attempted to verify the existence of such a "take price" formula, the two dealerships he contacted denied any such agreement with CCC. On July 9, 2001, the CCC representative maintained to Metz that it had "take price" agreements with each dealership it consulted, and denied that CCC selected comparable vehicles "at the lowest end of the price spectrum" in making its valuations.

In early August 2001, Metz requested that CCC provide him copies of the written agreements between CCC and the dealerships for determining the below-market-price valuations that the representative said were in CCC's possession. On August 8, 2001, the representative told Metz he was trying to locate that documentation and would respond as soon as he did. Metz never received a response. Finally, on February 27, 2004, a CCC representative told Metz that CCC does not investigate the damage history of the comparable vehicles used in making its valuations.

In contrast to the first amended complaint in the CCC action, the second amended complaint in the Farmers action contained detailed factual allegations concerning Metz's knowledge of CCC's valuation methodology as of 2000. According to the first amended complaint against Farmers, on December 30, 1999, a Farmers representative told Metz the insurance company sought a valuation of Metz's damaged vehicle, not the cost of a replacement vehicle. On January 4, 2000, in an effort to reach a settlement, Metz supplied the insurer with information on improvements he had made to his Galant before the accident, along with three comparable vehicle valuations he had obtained, all of which were greater than Farmers's December 30 offer.

Metz further alleged in the Farmers action that the following day, during settlement negotiations with the Farmers representative, Metz said that his own investigation showed that CCC's valuation was "inaccurate" because the "comparables listed in the CCC valuation were based on false information." Metz had discovered that two of the cars had been sold prior to the date on which CCC stated that it had inspected them. Metz had also learned that one of those cars had been sold for an amount greater than that listed in CCC's valuation. In the same conversation, the Farmers representative said the insurer stood by its valuation, which was based in part on CCC's valuation. The representative also stated that the insurer's valuation included a discount below the asking price for the comparable vehicles. Additionally, as of March 2000, "Metz's own investigation of comparable vehicles revealed that the vehicles he found were uniformly listed at a much higher price than those selected by CCC, [Creative Automotive Consultants, or B.I.D. Enterprises] and used by Farmers for [its] violations." In a subsequent discussion on March 9, 2000, a Farmers representative again stated that the insurer's valuation was based in part on the valuation it received from CCC. Five days later, the Farmers representative again stated that the insurer's valuation reflected an anticipated sticker price negotiation discount or "take price."

In his CCC complaint, Metz alleged CCC's valuation procedures violated section 1871.7, subdivision (b), by: (1) using an undisclosed "take price" or arbitrary discount from the sticker price of comparable vehicles, based on the unsubstantiated assumption that insurance claimants will be able to negotiate

a discounted price for replacement vehicles; (2) failing to investigate the damage history or the mechanical condition of the comparable vehicles used in making valuations; (3) falsely claiming its valuations are made in accordance with state law, including section 790.03, and California Code of Regulations, title 10, chapter 5, subchapter 7.5, section 2695.1 et seq. (Fair Claims Settlement Practices Regulations);[6] (4) gathering price quotations for a number of comparable vehicles, but choosing to use only those at the "low end" in calculating the valuation; and (5) making statements containing false or misleading information about facts material to policyholders' claims, while concealing its unlawful valuation methods, from the time that insurance policies are sold, during the claims process, and prior to the settlement of claims.[7]

Metz further alleged that CCC and unnamed defendants violated section 1871.7, subdivision (b), not only by each such false or misleading statement made in connection with the valuation process, but also by concealment of its improper valuation method and by conspiring with unnamed defendants to deprive policyholders of the full amount of their insurance benefits. He also alleged that CCC and unnamed defendants realized unlawful profits through the perpetration of this "scheme" to deprive policyholders of the full amount of their insurance benefits. Although Metz sought to prosecute this action on behalf of the State of California and alleged that CCC engages in the same conduct as to other policyholders, the only violations he identifies are those pertaining to his own insurance claim for the loss of his Galant.

## DISCUSSION

### THE DEMURRER WAS PROPERLY SUSTAINED

Metz argues the trial court erred in sustaining the demurrer to the first amended complaint on the basis that the action was time-barred because (1) the three-year limitations period did not begin to run until he had actual notice of all the facts he alleged in support of his claim, (2) CCC made

---

[6] The CCC complaint, however, contains no allegations of any such affirmative representations by CCC.

[7] In his complaint in the Farmers action, Metz alleged defendants violated section 1871.7, subdivision (b) in three basic ways: (1) by using arbitrary discounts from the sticker prices of comparable vehicles, based on the unsubstantiated assumption that insurance claimants will be able to negotiate a discounted price for replacement vehicles; (2) by gathering price quotations for a number of comparable vehicles, but choosing to use only those "at the low end of the price spectrum" in calculating the valuation; and (3) by making statements containing false or misleading information about facts material to policyholders' claims, while concealing its unlawful valuation methods, from the time that insurance policies are sold, during the claims process, and prior to the settlement of claims.

actionable statements less than three years before filing the original complaint, and (3) the allegations of an ongoing conspiracy served to delay the accrual of his cause of action. He also argues the Farmers and CCC actions were not "related" for purposes of section 1871.7, subdivision (e)(5)'s requirement that only the district attorney or Insurance Commissioner may file such actions. We disagree.

*A. Standard of Review*

" 'In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]' " (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 999 [24 Cal.Rptr.3d 474].) We may affirm a trial court judgment on any basis presented by the record whether or not relied upon by the trial court. (*Ibid.*)

As is particularly relevant to this appeal, " '[t]he complaint should be read as containing the judicially noticeable facts, "even when the pleading contains an express allegation to the contrary." [Citation.] A plaintiff may not avoid a demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint or by suppressing facts which prove the pleaded facts false. [Citation.]' [Citations.]" (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1491 [49 Cal.Rptr.3d 227].) Similarly, "[u]nder the sham pleading doctrine, plaintiffs are precluded from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers or motions for summary judgment. (See *Hendy v. Losse* (1991) 54 Cal.3d 723, 742–743 [1 Cal.Rptr.2d 543, 819 P.2d 1] [affirming an order sustaining defendants' demurrer without leave to amend when the plaintiff filed an amended complaint omitting harmful allegations from the original unverified complaint]; see also *Colapinto v. County of Riverside* (1991) 230 Cal.App.3d 147, 151 [281 Cal.Rptr. 191] ['If a party files an amended complaint and attempts to avoid the defects of the original complaint by either omitting facts which made the previous complaint defective or by adding facts inconsistent with those of previous pleadings, the court may take judicial notice of prior pleadings and may disregard any inconsistent allegations.'].)" (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425 [42 Cal.Rptr.3d 807] (*Deveny*), fn. omitted.) Accordingly, Metz is bound by his allegations in the Farmers action concerning his knowledge of CCC's conduct.

To the extent we must determine the legal question of whether section 1871.7's limitation period requires reasonable inquiry notice or actual notice of the actionable facts, and to the extent we must interpret the meaning of section 1871.7's limitation on the filing of related actions, our review is de novo. (*State of California ex rel. Nee v. Unumprovident Corp., supra,* 140 Cal.App.4th at p. 445.) "The standards we employ in interpreting statutes of limitation are well established. 'Our function, as with the construction of any statute, is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In the first instance, we look to the plain meaning of the statutory language. If further analysis is necessary, we apply a reasonable and commonsense interpretation, avoiding absurdity. [Citations.] We also consider the legislative purpose and public policy particularly relevant to statutes of limitation. . . . [Citation.]' [Citation.]" (*Deveny, supra,* 139 Cal.App.4th at p. 420; see also *Nee, supra,* 140 Cal.App.4th at p. 446.)

With regard to the statute of limitations aspect of the trial court's ruling, we note: "While the bar of the statute of limitations may be considered a harsh result where there is an otherwise meritorious cause of action, as a matter of policy, this defense 'operates conclusively across-the-board. It does so with respect to *all* causes of action, both those that do not have merit and also those that do. That it may bar meritorious causes of action as well as unmeritorious ones is the "price of the orderly and timely processing of litigation" [citation]—a price that may be high, but one that must nevertheless be paid.' [Citation.]" (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1282 [45 Cal.Rptr.3d 222].) On the other hand, " '[a] demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred. [Citation.] In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred. [Citation.]' (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].)" (*Geneva Towers Ltd. Partnership v. City and County of San Francisco* (2003) 29 Cal.4th 769, 781 [129 Cal.Rptr.2d 107, 60 P.3d 692]; see also *Deveny, supra,* 139 Cal.App.4th at p. 420 ["In general, the legislative purpose behind such statutes is to prevent plaintiffs from asserting stale claims."].)

### B. *The Statutory Framework*

We recently explained that "taken as a whole, section 1871 et seq. is specifically tailored toward preventing and punishing the making of fraudulent claims to insurance companies." (*Nee, supra,* 140 Cal.App.4th at p. 449.) Subdivision (a) of section 1871.7 provides: "It is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits . . . under a contract of

insurance or that will be the basis for a claim against an insured individual or his or her insurer." Metz, of course, being the insurance claimant on the underlying transaction and seeking to vindicate the rights of similarly situated policyholders, does not allege any fraudulent insurance claim.

Rather, as he cannot allege a section 1871.7, subdivision (a) violation against CCC, Metz seeks to allege a violation under section 1871.7, subdivision (b), which authorizes an action "on behalf of the state against 'every person' who violates Penal Code sections 549 and 550." (*Nee, supra*, 140 Cal.App.4th at p. 447.) Similarly, while Penal Code section 550 generally criminalizes false or fraudulent insurance claims, Metz seeks to ground his action on subdivision (b) of that statute, which, among other things, criminalizes those who "(1) Present or cause to be presented any written or oral statement as part of, or in support of *or opposition to*, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact. [¶] (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of *or opposition to*, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact. [¶] (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled." (Pen. Code, § 550, subd. (b)(1)–(3), italics added.)

It is Metz's theory that CCC's valuation statements made in connection with the insurance claim on his Galant violated Penal Code section 550, subdivision (b)(1) and (2), because they were made in opposition to Metz's claim for payment under his Farmers policy with CCC's knowledge that they contained false and misleading facts as to a material fact—the proper value of a comparable vehicle. He also claims that CCC's failure to disclose to Metz the method it used in making its valuation violated subdivision (b)(3) of Penal Code section 550.

Section 1871.7 contains its own limitations provision. Under subdivision (*l*)(1), "[a]n action pursuant to this section may not be filed more than three years after the discovery of the facts constituting the grounds for commencing the action."[8] The statute contains an additional limitation on the right to intervene or to bring related actions: "When a person or governmental agency

---

[8] Additionally, notwithstanding that subdivision's three-year period, "no action may be filed pursuant to this section more than eight years after the commission of the act constituting a violation of this section or a violation of Section 549, 550, or 551 of the Penal Code." (§ 1871.7, subd. (*l*)(2).)

brings an action under this section, no person other than the district attorney or commissioner may intervene or bring a related action based on the facts underlying the pending action unless that action is authorized by another statute or common law." (§ 1871.7, subd. (e)(5).)

## C. *Application of the Three-year Limitations Period*

Metz argues the statute of limitations did not begin to run until he had actual notice of every fact alleged in his complaint, including those he discovered in the period from June 2001 through February 2004, less than three years before he filed the CCC complaint. CCC responds that the rule of inquiry notice, generally applicable to fraud claims, applies to this particular insurance fraud provision. As such, CCC argues Metz's knowledge as of January and March 2001 that CCC had based its valuations of the Galant on false information was sufficient to trigger the commencement of the statute and bar his claim, filed more than three years afterwards.

Although no published California case has yet addressed whether section 1871.7, subdivision (*l*)'s limitation period requires actual or inquiry notice to trigger the running of the three-year limitations period, we find two recent decisions dealing with analogous provisions to be highly instructive. First, in *Debro v. Los Angeles Raiders* (2001) 92 Cal.App.4th 940 [112 Cal.Rptr.2d 329] (*Debro*), the appellate court interpreted the meaning of the word "discovery" in the context of Government Code section 12654, subdivision (a) (" '[a] civil action under Section 12652 may not be filed more than three years after the date of discovery' "). (*Debro, supra*, 92 Cal.App.4th at p. 948, italics omitted.) As the *Debro* court explained, "the term 'discovery' is not foreign to California's statutes of limitation. Long before the Legislature used that term in Government Code section 12654, it was used—and interpreted by California courts—in connection with the limitations period for causes of action based on common law fraud and mistake. (Code Civ. Proc., § 338, subd. (d).)" (*Debro, supra*, 92 Cal.App.4th at p. 950; see *Deveny, supra*, 139 Cal.App.4th at pp. 420–421.)

The *Debro* court began its analysis by noting that Code of Civil Procedure section 338, subdivision (d), includes common law fraud among the causes of action that must be asserted within three years. That provision does not distinguish between actual or inquiry notice, but states that a fraud cause of action does not accrue " 'until the discovery, by the aggrieved party, of the facts constituting the fraud.' " (*Debro, supra*, 92 Cal.App.4th at p. 950, quoting Code Civ. Proc., § 338, subd. (d).) Nevertheless, this state's courts "have long interpreted Code of Civil Procedure section 338 to commence upon the discovery by the aggrieved party of the fraud *or* facts that would lead a reasonably prudent person to *suspect* fraud." (*Debro, supra*, 92

Cal.App.4th at p. 950, citing *Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177].) Such a rule strikes the proper balance between the competing purposes inherent in the limitation period: In order to promote resolution of claims on the merits, inquiry notice protects fraud victims from having the limitations period run before they are even aware of the fraud; however, it also avoids the undue delay and opportunistic behavior that would tend to result from a rule that required awareness of every fact necessary for a fraud claim. (*Debro*, at p. 950.)

The *Debro* court therefore found it appropriate to interpret the discovery provision in Government Code section 12654, subdivision (a) in the same manner as the provision for fraud claims under Code of Civil Procedure section 338: "[T]his interpretation balances the policy of avoiding stale lawsuits with the policy of providing a reasonable time for a plaintiff to discover a false claim. Furthermore, our interpretation is consistent with the tenets of Civil Code section 19, which reads: 'Every person who has actual notice of circumstances *sufficient to put a prudent man upon inquiry* as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact.' (Italics added.) Consequently, circumstances which put a reasonable person on inquiry of a false claim are constructive notice of the false claim itself." (*Debro, supra*, 92 Cal.App.4th at p. 950; see also *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 [245 Cal.Rptr. 658, 751 P.2d 923] ["Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her."].)

In *Deveny, supra*, 139 Cal.App.4th 408, the court relied on the *Debro* rationale to find the inquiry notice rule applicable to the one-year "discovery" provision in Corporations Code section 25506 for specified securities fraud claims. The relevant portion of Corporations Code section 25506 provided "that an action be brought before 'the expiration of one year after the discovery by the plaintiff of the facts constituting the violation . . . .' " (*Deveny, supra*, 139 Cal.App.4th at p. 419, quoting Corp. Code, § 25506, subd. (a).) In addition, the *Deveny* court found support for its interpretation in another established rule of statutory construction as set forth in *People v. Lopez* (2003) 31 Cal.4th 1051, 1060 [6 Cal.Rptr.3d 432, 79 P.3d 548]: "When legislation has been judicially construed and a subsequent statute on a similar subject uses identical or substantially similar language, the usual presumption is that the Legislature intended the same construction, unless a contrary intent clearly appears." (See *Deveny, supra*, 139 Cal.App.4th at p. 422.) " 'Given the Legislature's presumed understanding of the judicial interpretation of the term "discovery" in other statutes of limitation, it is reasonable to assume that it would have used a word other than "discovery" if it intended for the

limitations period to commence only upon actual knowledge of a violation. [Citation.]' " (*Id.* at pp. 422–423, quoting *Debro, supra,* 92 Cal.App.4th at p. 953.)

The three-year discovery provision in section 1871.7 was added as part of the 1999 amendments to the statute, long after our Supreme Court's decisions establishing the inquiry notice standard as the general rule for determining when tort claims, including those for fraud, accrue. (See *Miller v. Bechtel Corp., supra,* 33 Cal.3d at p. 875; *Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at pp. 1110–1111.) Moreover, we note that section 1871.7, subdivision (b) gives citizens the right to enforce specified insurance fraud provisions in the Penal Code, including Penal Code section 550—the substantive basis for Metz's sole cause of action. The gravamen of that criminal offence is fraud. (*People v. Kanan* (1962) 208 Cal.App.2d 635, 636 [25 Cal.Rptr. 427] [construing predecessor statute].) Penal Code section 803, subdivision (c) provides that the limitations period applicable to insurance fraud "does not commence to run until the discovery of an offense described in this subdivision." In *People v. Zamora* (1976) 18 Cal.3d 538, 561–562 [134 Cal.Rptr. 784, 557 P.2d 75] (*Zamora*), our Supreme Court held that a "reasonable diligence" standard applies to insurance fraud offenses, analogous to the inquiry notice standard "that the courts have read into the 'discovery' provision of the statute of limitations for tort actions based on fraud as set forth in Code of Civil Procedure section 338, subdivision 4. [Citation.] In that context we have held that the word 'discovery' is not synonymous with actual knowledge." (Fn. omitted.) As such, it would be particularly anomalous to impute an actual knowledge requirement as to section 1871.7, subdivision (*l*), when the Legislature chose not to specify one.

■ As the trial court found, Metz had inquiry notice more than three years before he filed the complaint against CCC. Under established California Supreme Court precedent, "the plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]. He has reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements. [Citation.]" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397–398 [87 Cal.Rptr.2d 453, 981 P.2d 79], fn. omitted.) Such reasonable suspicion exists when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry: "[H]e need not know the 'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place . . . ." (*Id.* at p. 398.)

By January 2000, Metz's own investigation revealed that CCC's valuation was "inaccurate" because the "comparables listed in the CCC valuation were based on false information." At that time, he certainly had good reason to suspect CCC had engaged in precisely the kinds of conduct he alleges to be fraudulent. Farmers had informed him that its valuation included a discount below the asking price for comparable vehicles and that it had relied on CCC's valuation. Metz had also discovered the comparable vehicles used by CCC for its valuation had been underpriced and CCC did not do the kind of accident history investigation Metz believed was legally required. By March 2000, Metz had identified higher priced comparables that CCC failed to include in making its valuation. Finally, in March 2000, a Farmers representative told Metz that the insurer's valuation was based in part on the valuation it received from CCC, and the insurer's valuation reflected an anticipated sticker price negotiation discount or "take price." As our Supreme Court has explained, once Metz gained that degree of knowledge, he was obligated to file his action within the limitations period, and additional investigation should have been conducted through pretrial discovery. (*Norgart v. Upjohn Co., supra,* 21 Cal.4th at pp. 397–398.)

■ Nevertheless, Metz argues that the continuing accrual rule authorized his delayed filing. Under that doctrine, "[w]hen an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period. [Citation.] The continuing accrual rule has been applied in a variety of actions involving the obligation to make periodic payments under California statutes or regulations." (*Hogar Dulce Hogar v. Community Development Commission* (2003) 110 Cal.App.4th 1288, 1295 [2 Cal.Rptr.3d 497], citing inter alia, *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 818–825 [107 Cal.Rptr.2d 369, 23 P.3d 601] [doctrine applied to action involving taxes].) Metz's action does not involve a recurring obligation or any such periodic payment obligations. Rather, *every* fraudulent statement or admission Metz alleges arose out of a single transaction—his insurance claim for the 1999 total loss of the Galant—which was resolved before the limitations period ran.

■ Nor do Metz's conspiracy allegations toll the running of the statute. "It has long been the rule in conspiracy cases that a limitation period begins to run from the time of the last overt act committed in furtherance of the conspiracy." (*Zamora, supra,* 18 Cal.3d at p. 548.) Metz asserts that the last overt act of the alleged conspiracy to induce a fraudulently low settlement of Metz's insurance claim was either CCC's failure to provide requested documents of "take price" agreements in August 2001 or CCC's statement on February 27, 2004, that it does not investigate the damage history of the comparable vehicles used in making its valuations.

■ However, as CCC points out, "[i]n order to state a cause of action based upon a conspiracy theory the plaintiff must allege the formation and operation of the conspiracy, the wrongful act or acts done pursuant to it, and the damage resulting from such acts. [Citation.] In making such allegations bare legal conclusions, inferences, generalities, presumptions, and conclusions are insufficient. (*117 Sales Corp.* v. *Olsen* (1978) 80 Cal.App.3d 645, 650 [145 Cal.Rptr. 778].)" (*Nicholson v. McClatchy Newspapers* (1986) 177 Cal.App.3d 509, 521 [223 Cal.Rptr. 58].) Metz's conspiracy allegations—that CCC and unnamed defendants conspired to conceal their improper loss valuations—amount to bare legal conclusions.

In any event, the most recent acts alleged by Metz do not qualify as overt acts because they were made after the primary purpose of the alleged conspiracy had been realized—the inducement of an unfair insurance settlement on Metz's Galant. "[A]cts committed by conspirators subsequent to the completion of the crime which is the primary object of a conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy. Consequently, upon successful attainment of the substantive offense which is the primary object of the conspiracy, the period of the statute of limitations for the conspiracy begins to run at the same time as for the substantive offense itself." (*Zamora, supra,* 18 Cal.3d at p. 560, fn. omitted; see *Livett v. F. C. Financial Associates* (1981) 124 Cal.App.3d 413, 419 [177 Cal.Rptr. 411] ["Once this offense has been completed, the statute of limitations on the conspiracy commences running, and subsequent conduct related to the conspiracy, such as flight or concealment, does not constitute 'overt acts' sufficient to recommence the statutory period."].) This was not a case, such as *People v. Williams* (1979) 97 Cal.App.3d 382, 390–391 [158 Cal.Rptr. 778], in which the conspiracy count contained adequate allegations of the purposeful concealment of a crime for a period of time after its commission. Metz merely alleges that in response to his investigation, CCC either made admissions of—or failed to admit—the allegedly wrongful manner in which it conducted its 1999 valuation.

D. *Application of Section 1871.7's Limitation on Filing Related Actions*

As an alternative basis for its ruling, the trial court found that Metz's action against CCC was "based on the same facts underlying the Farmers action," which had been previously filed and was currently pending. Accordingly, the subsequent action was barred by section 1871.7, subdivision (e)(5)'s requirement that only the district attorney or Insurance Commissioner may bring a related action based on the facts underlying a pending action. The trial court was correct.

■ The relevant Insurance Code provision provides that once "a person or governmental agency" has brought an action under section 1871.7, only

the district attorney or Insurance Commissioner "may intervene or bring a related action based on the facts underlying the pending action unless that action is authorized by another statute or common law." (§ 1871.7, subd. (e)(5).) The statute defines a "related action" as an action that is based on the facts underlying the pending section 1871.7 action. (Cf. *Rothschild v. Tyco Internat. (US), Inc.* (2000) 83 Cal.App.4th 488, 499 [99 Cal.Rptr.2d 721] [bar on " 'related actions' " under Government Code section 12652, subdivision (c)(10) applies only to subsequent qui tam actions filed under the False Claims Act, not unfair competition law claim].) As the trial court found, the CCC action fits that definition perfectly.

In the Farmers action, Metz alleged a section 1871.7 cause of action arising out of the same insurance transaction as the one on which the CCC action is based. Indeed, although Metz did not name CCC as a defendant in the Farmers action, he alleged that CCC participated in making the same valuations that he contends were fraudulent under Penal Code section 550, subdivision (b), for purposes of both the CCC and the Farmers actions. Neither the fact that CCC was not a named party to the prior action nor the presence in the subsequent action of additional allegations concerning CCC serves to make the prior action any less related. Those additional allegations all arose out of the facts of the prior action. Stated simply, we reject Metz's implicit argument that "related" means "identical."

Nor does our decision in *People ex rel. Allstate Ins. Co. v. Weitzman, supra,* 107 Cal.App.4th 534 (*Weitzman*) advance Metz's argument. As the trial court recognized, that decision was not concerned with the interpretation and application of section 1871.7, subdivision (e)(5), but rather of subdivision (h)(2), which serves a different statutory purpose. The latter subdivision does not mention or implicate "related actions." Instead, it proscribes our courts from exercising jurisdiction over "an action under this section based upon the public disclosure of allegations or transactions . . . , unless . . . the person bringing the action is an original source of the information." (§ 1871.7, subd. (h)(2)(A).) As we explained in *Weitzman,* "the California statute was intended to limit the availability of qui tam actions so as to protect against 'opportunistic' or 'parasitic' actions." (*Weitzman, supra,* 107 Cal.App.4th at p. 566.) Because Metz's underlying action against CCC fits the statutory definition of a related action that could have been brought only by the specified governmental agencies, there is no reason to assess whether the CCC action was opportunistic or parasitic.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to CCC Information Services, Inc.

Armstrong, Acting P. J., and Mosk, J., concurred.