# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-1619

UNITED STATES OF AMERICA on the relation of
Christine Chovanec,

*Plaintiff-Appellant*,

*v.*

APRIA HEALTHCARE GROUP INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 4543—**Charles P. Kocoras**, *Judge*.

ARGUED DECEMBER 4, 2006—DECIDED MAY 19, 2010

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
SYKES, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.  The district court dismissed
this *qui tam* action under 31 U.S.C. §3730(b)(5), which
provides: "When a person brings an action under this
subsection, no person other than the Government may
intervene or bring a related action based on the facts
underlying the pending action." The complaint accuses

Apria Healthcare of fraudulently billing the Medicare and Medicaid programs for medical devices (such as oxygen tanks) and related services that were unnecessary or should have been recorded under less expensive reimbursement codes. According to the complaint, the fraud took place at Apria's office in Morton Grove, Illinois, from 2002 through 2004. When Christine Chovanec filed this suit, two other *qui tam* actions against Apria were pending: *United States ex rel. Costa v. Apria Healthcare Group, Inc.*, filed in California in 1998, and *United States ex rel. Wickern v. Apria Healthcare Group, Inc.*, filed in Kansas in 1999. Both *Costa* and *Wickern* charged Apria with the same sort of inappropriate billing, often called "miscoding" or "upcoding." The district court deemed Chovanec's suit "related" to these suits because it too alleged miscoding; differences in time and place are irrelevant, the court stated.

Four days after the district court dismissed Chovanec's suit, the *Costa* and *Wickern* actions were settled under the auspices of the Department of Justice, which had taken over the litigation. (Perhaps this is why *Wickern* was not itself dismissed under §3730(b)(5).) Apria agreed to pay $17,600,000 on account of claims for reimbursement submitted from June 1995 through December 31, 1998. Chovanec then moved for reconsideration, arguing that the settlement not only ended the prior actions that blocked her suit but also established (through the time limits of the settlement) that the three *qui tam* actions do not overlap. The district court denied this motion, and the effect of the settlement is our first order of business.

Chovanec treats §3730(b)(5) as if it read something like: "While another action under this section is pending, no person other than the Government may continue to prosecute a related action. . .". Then §3730(b)(5) would do nothing to block an infinite series of claims; me-too actions could proliferate, provided only that the copycat asked for a stay until the action ahead of it in the queue had been resolved. That's not at all what the actual statute says, however. It provides that if one person "brings an action" then no one other than the Government may "bring a related action" while the first is "pending".

One "brings" an action by commencing suit. Many statutes are of the form "do not bring an action until. . .", where the condition is exhausting administrative remedies, negotiating, or waiting a specified time. Statutes of this form are understood to forbid the commencement of a suit; an action (or a given claim within a larger action) "brought" while the condition precedent is unsatisfied must be dismissed rather than left on ice. See, e.g., *Hallstrom v. Tillamook County*, 493 U.S. 20 (1989); *McNeil v. United States*, 508 U.S. 106 (1993); *Jones v. Bock*, 549 U.S. 199, 219–24 (2007). And *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1188 (9th Cir. 2001), applied this principle to §3730(b)(5), holding that a follow-on suit must be dismissed if its predecessor is still pending when the new one is filed.

Thus "a related action based on the facts underlying the pending action" must be dismissed rather than stayed. And if the action is related to and based on the

facts of an earlier suit, then it often cannot be refiled—for, once the initial suit is resolved and a judgment entered (on the merits or by settlement), the doctrine of claim preclusion may block any later litigation. The plaintiff in a *qui tam* action, after all, is the United States rather than the relator; whether the United States wins or loses in the initial action, that is the end of the dispute. Only when the initial action concludes without prejudice (or covers a different transaction) will a later suit—by the original relator, a different relator, or the Department of Justice—be permissible. See *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009); but see *United States ex rel. Campbell v. Redding Medical Center*, 421 F.3d 817 (9th Cir. 2005) (if a freeloader is the first to file and that action is doomed by the requirement that the relator be the original source of the information, see 31 U.S.C. §3730(e)(4), then the real original source may file a later suit without transgressing the limit set by subsection (b)(5) once the first suit is no longer pending).

So is Chovanec's claim "a related action based on the facts underlying" the *Costa* and *Wickern* suits? The actions are related in the sense that both allege that Apria billed the federal government too much for medical devices and services. They are distinct in the sense that the first actions cover the period 1995–98, while Chovanec's claim covers the period 2002–04 and concerns conduct at just one of Apria's offices in Illinois. Which scope of "related" is right—the broad reading or the narrow one? That the settlement of the first-filed actions covers only 1995–98 is a factor in favor of the narrow reading, though not a sufficient one: §3730(b)(5)

refers to the "facts underlying the pending action" (that is, to the complaint and potentially the record compiled in the suit) rather than to the parties' later choices. Identification of a "related" action must depend on the claim made in the initial suit and not the terms of the settlement, for it is the suit rather than the settlement that activates §3730(b)(5).

The disposition of a follow-on claim such as Chovanec's must come not from staring hard at the word "related" but from its context—both linguistic and functional. The full phrase describing the impermissible follow-on claim is: "a related action based on the facts underlying the pending action." It is not enough that claims be related in the loose sense that they arise out of the same general kind of wrongdoing; they must also have facts in common. Not identical facts; then a copycat claim could pass muster if the relator added some details missing from the initial complaint. As so often when a statute contains a word such as "facts" and the question arises "*which* facts," courts supply the answer: "the *material* facts" (or alternatively "the essential facts"). That is what every court of appeals to consider this phrase has done. See *United States ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13, 32–34 (1st Cir. 2009); *United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.*, 149 F.3d 227, 232–34 (3d Cir. 1998); *United States ex rel. Branch Consultants v. Allstate Insurance Co.*, 560 F.3d 371, 377–80 (5th Cir. 2009); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 971 (6th Cir. 2005); *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d at 1187–89; *United States ex rel. Grynberg v. Koch Gateway*

*Pipeline Co.*, 390 F.3d 1276, 1279–80 (10th Cir. 2004); *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217–18 (D.C. Cir. 2003).

We agree with that conclusion. One can't use an identical-facts approach (or a definition modeled on the same-facts version of claim preclusion that some states employ); that would read "related" out of the statute. But one also can't say that "all similar frauds are related" without reading the same-facts language out of the statute. In Einstein's universe, everything is related to everything else. A materiality rule accommodates both parts of the statutory phrase—though at the expense of posing the question what "material" means. It is a protean term that requires further analysis.

The other circuits that have addressed this subject understand the "material" or "essential" facts to be those on which the original relator is entitled to compensation if the suit prevails. There's a good reason for that view. Relators receive substantial awards for their services in bringing fraud to light—as much as 30% of the total to which the United States is entitled. See 31 U.S.C. §3730(d). The lure of this payoff is what induces people to do the work to uncover fraud and to bear the risk and expense of the litigation. Me-too suits designed to divert some of the reward to latecomers do not serve any useful purpose, and they weaken the incentive to dig out the facts and launch the initial action. What's more, secondary suits that do no more than remind the United States of what it has learned from the initial suit deflect recoveries from the Treasury to rewards under

§3730(d). The False Claims Act offers private relators bonanzas for valuable information. If a suit makes a claim for compensation without revealing anything new, then it is sensible to block it under §3730(b)(5) even if the relator is an "original source" (a technical term elucidated in *Rockwell International Corp. v. United States*, 549 U.S. 457 (2007)). The author of the fraud won't escape when the first suit (or the ensuing federal investigation) tells the agency everything it needs to know, and the full recovery will go to the Treasury, without an unnecessary diversion.

Chovanec did not propose to muscle in on the Costa and Wickern relators or siphon off any portion of their reward. Still, to understand whether the suits materially overlap we must know whether the initial suits alleged frauds by rogue personnel at scattered offices or instead alleged a scheme orchestrated by Apria's national management. Allegations about a scam in California or Kansas in the 1990s would not reveal to the United States any risk of a scam in Illinois in 2003—beyond the obvious fact that any medical provider can engage in upcoding, and that sort of generic knowledge differs from "the facts underlying the pending action."

So what did the Costa or Wickern relators allege? The United States, which defends the judgment dismissing Chovanec's suit, believes that they alleged a nationwide scheme, which would indeed give the Medicare and Medicaid systems enough knowledge to spark further investigations without the goad of *qui tam* litigation or the need to pay a private relator. We summarize here some allegations that led the United States to this view.

Wickern's complaint alleged that Apria modified its computer system, which handles entries from all of its offices, to reduce accountability of its employees, including deleting the identification of the persons who enter billing information into the system. This made it possible for workers to engage in upcoding without personal risk, implying that the national managers wanted to encourage the practice. This inference was fortified by an allegation that Apria's national headquarters provided its customer service representatives with "cheat sheets" of examples showing how the billing records could be modified to reflect more or different services (or more expensive devices) than physicians had prescribed. The headquarters also allegedly told representatives to use these cheat sheets rather than the information provided by the physicians. What's more, the complaint alleges that Apria's headquarters pressured employees to bill the Medicare program without proper documentation and coached physicians to record their work in categories that could support higher bills (or would qualify for some payment even though the actual service was outside the list of compensable procedures or devices). The *Costa* and *Wickern* complaints couldn't allege that any of this conduct was certain to continue past their filing dates (1998 and 1999), but neither did either complaint allege that it had stopped. Fraud in Illinois in 2002 thus is within the scope of a national, continuing, scheme alleged in 1998 and 1999.

What can be said for the relator in this proceeding is that the United States apparently did not conduct the

sort of follow-up investigation and prosecution that would have prevented Apria's office in Illinois from conducting an upcoding scam in the early 2000s. The United States does not contend that the allegations in *Costa* and *Wickern* gave it *actual* notice of problems (on-going or impending) in Illinois. If the United States was going to remain in the dark indefinitely about what was happening in Illinois during and after 2002, then Chovanec supplied valuable information and is entitled to compensation. (Here and elsewhere in the opinion we indulge the assumption that Apria submitted false claims. That's the complaint's allegation, which we must accept for current purposes even though Apria denies wrongdoing.)

Still, this does not carry the day for Chovanec—and for the same reason that the time-limited settlement of *Costa* and *Wickern* is not conclusive in her favor. Section 3730(b)(5) asks about what is related to the "facts under-lying the pending action." It does not make anything turn on whether the United States puts those facts to their best use. The allegations of the *Costa* and *Wickern* suits are what they are, and as those complaints allege an ongoing fraud orchestrated by Apria's national staff, the decision of any given office to participate in the scheme is related to those allegations.

So although we read "related action based on the facts underlying the pending action" to specify only the materi-ally similar situations that objectively reasonable readings of the original complaint, or investigations launched in direct consequence of that complaint, would

have revealed, Chovanec's complaint still falls within §3730(b)(5).

The district court dismissed the complaint with prejudice. As we explained above, however, §3730(b)(5) applies only while the initial complaint is "pending*." Costa* and *Wickern* are no longer pending (and weren't pending when the district court denied Chovanec's motion for reconsideration), so she is entitled to file a new *qui tam* complaint—entitled, that is, as far as §3730(b)(5) goes. Perhaps the allegations in *Costa* and *Wickern* (or other sources) count as public disclosures that prevent follow-on litigation by anyone other than an original source. 31 U.S.C. §3730(e)(4)(A). See *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 130 S. Ct. 1396 (2010). Or perhaps the disposition of *Costa* and *Wickern*, coupled with the doctrines of claim and issue preclusion, blocks anyone (including the United States) from filing additional suits dealing with any upcoding scheme that Apria orchestrated nationally. To avoid preclusion, Chovanec might have to establish that events in Illinois were entirely unrelated to the national scheme of the 1990s, perhaps representing a recurrence (at the behest of local managers) after the national fraud had ended. If Chovanec could show that, the allegations would avoid even §3730(b)(5).

Because *Costa* and *Wickern* were not pending when the district court made its final decision—and because Chovanec may be able to frame a new complaint that would survive a motion to dismiss—the current proceeding should have been dismissed without prejudice.

We vacate the judgment of the district court and remand with instructions to dismiss the complaint without prejudice.