Filed 12/14/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE ex rel. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>     Plaintiff and Appellant,<br><br>          v.<br><br>SONNY RUBIN et al.,<br><br>     Defendants and Respondents. | G059509<br><br>(Super. Ct. No. 30-2019-01107066)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, William D. Claster, Judge.  Reversed and remanded.

Katten Muchin Rosenman, Ryan M. Fawaz and Christopher B. Maciel for Plaintiff and Appellant.

Khouri Law Firm, Michael J. Khouri and Behzad Vahidi for Defendants and Respondents.

\*          \*          \*

The Insurance Fraud Protection Act (IFPA) allows qui tam plaintiffs to file lawsuits on the government's behalf and seek monetary penalties against perpetrators of insurance fraud. Under the IFPA, a defrauder is assessed penalties for each fraudulent insurance claim it presented to insurers. To prevent duplicative lawsuits, the IFPA contains a "first-to-file rule" that bars parties from filing subsequent actions related to an already pending lawsuit. Here, plaintiff State Farm Mutual Automobile Insurance Company (State Farm) filed an IFPA action alleging defendants Sonny Rubin, M.D., Sonny Rubin, M.D., Inc., and Newport Institute of Minimally Invasive Surgery (collectively, defendants) fraudulently billed insurers for various services performed in connection with epidural steroid injections. A month prior, however, another insurer, Allstate (defined below), filed a separate IFPA lawsuit against the same defendants, alleging they were perpetrating a fraud on Allstate, also involving epidural steroid injections.

In this action, the trial court sustained defendants' demurrer to State Farm's complaint under the IFPA's first-to-file rule, finding it alleges the same fraud as Allstate's complaint. State Farm appeals, arguing its complaint alleges a distinct fraud. We agree the demurrer was incorrectly sustained, but for another reason. In applying the rule, the court and both parties only focused on whether the two complaints allege the same fraudulent scheme. But, in this matter of first impression, we find the IFPA's first-to-file rule requires an additional inquiry. Courts must also review the specific insurer-victims underlying each complaint's request for penalties. If each complaint seeks penalties for false insurance claims relating to different groups of insurer-victims, the first-to-file rule does not apply. A subsequent complaint is only barred under the first-to-file rule if the prior complaint alleges the same fraud and seeks penalties arising from the false claims, submitted to the same insurer-victims.

Here, both complaints largely seek penalties relating to separate pools of victims. Allstate's complaint only seeks IFPA penalties for the false insurance claims

2

that defendants presented *to Allstate*.  State Farm's broader action seeks penalties for all the false insurance claims that defendants submitted *to any insurer*.  Allstate is the only overlapping victim.  Thus, even if the two complaints allege the same fraud, State Farm is only precluded from pursuing IFPA penalties for the false claims that defendants billed to Allstate.  As to the other inquiry, there is partial overlap between the fraudulent schemes alleged in the complaints.  Both complaints allege a common scheme in which defendants presented false claims to insurers pertaining to epidural steroid injections.  However, State Farm's complaint also alleges a distinct scheme involving false charges for magnetic resonance imaging (MRI) interpretations that defendants billed independently from epidural spinal injections.

Based on these findings, as to the portion of State Farm's IFPA action relating to epidural steroid injections, the first-to-file rule only bars State Farm from pursuing penalties for the false claims that defendants allegedly submitted to Allstate.  It may still pursue penalties for any false claims that defendants submitted to other insurers.  For the portion of State Farm's action based on MRI charges billed independently from epidural spinal injections, State Farm may pursue penalties for any false claims that defendants submitted to any insurer, including Allstate.

For these reasons, we find the demurrer was wrongly sustained and reverse the judgment.

I

FACTS AND PROCEDURAL HISTORY

*A.  Statutory Background*

The IFPA (Ins. Code, § 1871 *et seq*.)[1] was enacted in 1993 to combat workers' compensation fraud.  (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 547 (*Weitzman*).)  It was extended to insurance fraud through a 1994

---

[1]  Subsequent statutory references are to the Insurance Code unless otherwise stated.

amendment. (*Id*. at pp. 547-548.) As described in a senate committee report, the purpose of the 1994 amendment was "'to enact a comprehensive package of laws to assist in the prevention, identification, investigation, and prosecution of insurance fraud.'" (*Id*. at pp. 548-549.) Likewise, the amendment's sponsor declared its purpose was "'[t]o help state and local law enforcement agencies *and insurers* to fight insurance fraud, without creating expensive new bureaucracies and breaking the bank in [a] tight budget year.'" (*Ibid*.)

To assist in the fight against insurance fraud, the IFPA contains a qui tam provision empowering interested persons to file lawsuits on behalf of the government against perpetrators of insurance fraud. "Under subdivision (b) of Insurance Code section 1871.7, '[e]very person' who engages in insurance fraud . . . is subject to penalties and assessments. [Citation.] Section 1871.7, subdivision (e)(1) expressly authorizes any 'interested person[]' to bring a qui tam action to recover damages and penalties for fraudulent insurance claims both for that person and for the State of California. [Citations.] The person who brings the qui tam action, called the 'relator,' stands in the shoes of the People of the State of California, who are deemed to be the real party in interest. [Citations.] The relator in a qui tam action under section 1871.7 does not personally recover damages but, if successful, receives a substantial percentage of the recovery as a bounty." (*People ex rel. Strathmann v. Acacia Research Corp.* (2012) 210 Cal.App.4th 487, 500 (*Strathmann*).) Penalties are assessed for each fraudulent claim presented by a defendant to a victim-insurer. (§ 1871.7, subd. (b).)

"The relator's complaint must be served on the district attorney and the Insurance Commissioner, who have 60 days to decide whether to intervene and proceed with the lawsuit. [Citation.] If the district attorney and the Insurance Commissioner both decline to take over the action [citation], the relator may proceed with the action and recover a bounty of 40 to 50 percent of the recovered proceeds, plus reasonable expenses and attorney fees . . . ." (*People ex rel. Alzayat v. Hebb* (2017) 18 Cal.App.5th 801, 813–

4

814.) "'A *qui tam* relator is essentially a self-appointed private attorney general, and his recovery is analogous to a lawyer's contingent fee. The relator has no personal stake in the damages sought—all of which, by definition, were suffered by the government.'" (*Strathmann*, *supra*, 210 Cal.App.4th at pp. 500-501.) "The IFPA's civil penalties are intended to be remedial and not punitive [citation], and they are not the exclusive remedies available for insurance fraud [citation]." (*People ex rel. Alzayat*, at pp. 813-814.)

This enforcement mechanism is intended to """provid[e] . . . incentives for individual citizens to come forward with information uniquely in their possession and to thus aid the Government in [ferreting] out fraud.'" [Citation.] The bounty advances the public purpose and benefit by encouraging private qui tam actions; '[i]ndeed, this prospect of reward may be the only means of inducing such private parties to come forward with their information.'" (*Strathmann*, *supra*, 210 Cal.App.4th at p. 502.)

Section 1871.7 also contains several provisions that bar repetitive lawsuits. It contains a "public disclosure rule," that precludes "parasitic or opportunistic actions by persons simply taking advantage of public information without contributing to or assisting in the exposure of the fraud."[2] (*Weitzman*, *supra*, 107 Cal.App.4th at pp. 558-559, 564.) The provision at issue here, section 1871.7, subdivision (e)(5), is generally known as a "first-to-file rule." As explained below, other state and federal statutory schemes contain similar first-to-file rules. The IFPA's first-to-file rule provides that "[w]hen a person or governmental agency brings an action under this section, no person

---

[2] Specifically, the public disclosure rule provides that "[n]o court shall have jurisdiction over an [IFPA] action . . . based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing in a legislative or administrative report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." (§ 1871.7, subd. (h)(2)(A).) This opinion is not intended to have any affect on the public disclosure rule.

other than the district attorney or commissioner may intervene *or bring a related action based on the facts underlying the pending action* unless that action is authorized by another statute or common law." (§ 1871.7, subd. (e)(5), italics added.)

### B. This Action

On October 23, 2019, State Farm filed this qui tam action under the IFPA against defendants, which are comprised of Sonny Rubin, M.D. (Dr. Rubin) and two entities he controls: Sonny Rubin M.D., Inc. (Rubin Inc.), the medical corporation through which Dr. Rubin bills the services he performs, and Newport Institute of Minimally Invasive Surgery (Newport Institute), an ambulatory surgery center owned and controlled by Dr. Rubin.

Dr. Rubin specializes in pain management procedures, including patients experiencing neck and/or back pain. State Farm alleges Dr. Rubin fraudulently billed for various services performed in connection with epidural steroid injections, a form of pain management. These services included: (1) fluoroscopy, (2) epidurography, (3) myelography, and (4) evaluation and management services.[3]

Fluoroscopy is used to obtain images of the internal structures of the body. A physician injects a dye into the targeted area and uses special equipment to view the flow of the dye. Epidural spinal injections are commonly performed under fluoroscopic guidance to ensure proper placement of the needle and flow of medication during the injection. When fluoroscopy is performed to assist with an epidural spinal injection, they

---

[3] State Farm alleges there are various forms of epidural steroid injections. The ones at issue here are translaminar and interlaminar injections. The distinctions between these injections are immaterial for purposes of this appeal, so we simply refer to them as epidural steroid injections. We also note the medical information in this opinion is taken from State Farm's complaint. Given the procedural posture of this case, we assume these allegations are true. (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 761-762.) Also, the medical information alleged by State Farm is not contested by defendants.

are billed together using the same Current Procedural Terminology (CPT) code. CPT codes are standardized five-digit numeric codes established by the American Medical Association. They are used by healthcare providers to quickly describe to insurers the services for which the provider is billing. According to State Farm, when one CPT code includes multiple components of a service or procedure, healthcare providers must use that code to support a single charge. A provider cannot "unbundle" that CPT code and separately bill for each individual component of the bundled code. State Farm alleges defendants inflated bills by improperly unbundling fluoroscopy services and charging them separately from epidural steroid injection procedures. This alleged creation of two separate charges fraudulently inflated defendants' total bills for these services.

Epidurography uses fluoroscopic imaging to assess the condition of a patient's epidural space in the spine. The physician injects a dye into the epidural space, without penetrating the dura (the membranous sheath that protects the spinal cord), to view its flow and determine the condition of the space. This is typically done if a physician believes the patient's epidural space may contain abnormalities that could impede or disrupt the flow of the injected solution. Myelography is similar to epidurography. While the latter is used to visualize the epidural space (the space outside the dura), myelography is used to visualize the space inside the dural membrane.

State Farm alleges Dr. Rubin submitted false bills for epidurography and myelography services purportedly done in connection with epidural spinal injections. State Farm claims these services were not performed or, if they were performed, were not medically necessary. Among other things, Dr. Rubin's medical records failed to note the clinical basis or rationale for either of these procedures. Nor did they contain summaries of any findings from the purportedly performed procedures, and Dr. Rubin was unable to produce any images or reports from these procedures when requested by State Farm. Further, a myelogram should not be performed on the same day as an epidural steroid

injection to protect patient safety.[4]  Yet Dr. Rubin's bills show these services were performed at the same time.  According to State Farm, this suggests these myelograms were not actually performed.

Physicians also provide evaluation and management services in connection with epidural spinal injections, such as obtaining medical histories, performing examinations, and rendering medical advice.  These services are normally a routine part of an epidural spinal injection.  As such, they are typically bundled together and charged through the same CPT code as the injection.  If a patient has a condition requiring abnormal evaluation and management services, the physician may submit a separate charge for those services using a separate CPT code.  State Farm asserts Dr. Rubin improperly billed for evaluation and management services with a separate CPT code when he did not provide any special service warranting a separate charge.

In addition to the above services, State Farm also alleges defendants engaged in fraudulent billing relating to MRI interpretations.  MRI is a procedure that produces images of the muscle, bone, tissue, and nerves.  These images must be interpreted by a physician, typically a radiologist.  State Farm asserts Dr. Rubin falsely billed for MRI interpretations that he did not perform.  Instead, he relied on the interpretations of third party radiologists, for which he could not bill.  To the extent he did perform any independent MRI interpretations, State Farm alleges those services were not medically necessary.  Among other things, Dr. Rubin did not provide independent written reports to support these MRI interpretation charges.

While the allegedly false charges for the other four procedures (fluoroscopy, epidurography, myelography, and evaluation and management services)

---

[4]  Epidural steroid injections contain a preservative that can damage the spinal cord. Because myelography involves penetration of the dural membrane, epidural steroid injections should not be performed on the same day to ensure the injected solution does not get near the spinal cord.

were all billed in connection with epidural steroid injections, the MRI charges largely were not. This is apparent from State Farm's complaint, which contains spreadsheets showing all the allegedly fraudulent charges billed by defendants to State Farm. Though a handful of the allegedly false MRI charges were billed in connection with epidural spinal injections, the bulk were not and are identified on the spreadsheet as standalone charges.

Based on the above allegations, State Farm asserts two IFPA causes of action against defendants. The first, against Dr. Rubin and Rubin, Inc., is based on the false claims Dr. Rubin made to insurers for all five services identified above (fluoroscopy, epidurography, myelography, evaluation and management services, and MRI interpretations). The second, against Dr. Rubin and Newport Institute, is based on false claims and fraudulent facility fee charges relating to certain fluoroscopy and myelography services purportedly performed by Dr. Rubin. For both causes of action, State Farm seeks broad relief, requesting penalties for all the false claims that defendants presented to any insurer under the same fraudulent scheme. Neither the Insurance Commissioner nor any district attorney intervened in State Farm's lawsuit.

## C. The Allstate Lawsuit

On September 27, 2019, a few weeks before State Farm filed this action, Allstate Insurance Company and several of its affiliates (collectively, Allstate) filed their own IFPA lawsuit against defendants and several other entities connected to Dr. Rubin. Allstate's complaint was still sealed when State Farm filed this action. Accordingly, there is no reason to believe State Farm's complaint derived any material information from Allstate.

The allegations in Allstate's complaint are far more generalized than State Farm's. Allstate asserts Dr. Rubin "exaggerated the severity of his patients' medical conditions and recommended pre-ordained courses of treatment without regard to patient

9

need, patients' medical histories, test results, imaging studies, and subjective complaints. For every patient that [Dr. Rubin] examined, he prepared . . . templated narrative reports containing uniform findings, used to support his pre-determined, 'one-size-fits-all' treatment regimens, including repeated epidural steroid injections and facet blocks, which were billed at exorbitant rates . . . ."

Allstate also alleges that "[t]hrough the manipulation of billing codes to maximize reimbursement, bills submitted by [defendants] grossly inflate[d] the value of the services rendered and often contain[ed] charges for treatment that was never provided or multiple charges for the same treatment." In particular, Dr. Rubin "engaged in several types of fraudulent billing practices, including 'unbundling' [CPT] codes, billing for treatment not rendered, and double billing when only one service was provided. The billing statements were knowingly presented to . . . [Allstate] by Defendants . . . including numerous instances of false, fraudulent, or misleading use of CPT codes to make it falsely appear that more treatment was rendered [than] actually occurred."

Significantly, though, Allstate's action only seeks IFPA penalties for the fraudulent claims that defendants presented to Allstate. It does not seek penalties for any false claims that defendants billed to other insurers. As with this action, neither the district attorney nor the Insurance Commissioner intervened in Allstate's lawsuit.

## D. Defendants' Demurrer

In this action, defendants demurred to State Farm's complaint on grounds it was barred by Allstate's action under the IFPA's first-to-file rule. The trial court agreed, finding the two "complaints allege[d] the same form of fraud, i.e., fraudulent billing through the manipulation of CPT codes." It sustained the demurrer but granted leave to amend. State Farm did not amend, and the court entered judgment against it. State Farm now appeals, arguing the court incorrectly sustained the demurrer. Generally, it maintains the first-to-file rule does not apply because the two complaints at issue allege

10

different frauds.  While we agree the demurrer should have been overruled, we reach that conclusion using a different analytical framework than that advanced by the parties.

II

DISCUSSION

*A.  Defendants' Request for Judicial Notice*

In first-to-file-rule analysis, the court's review is generally "limited to the four corners of the relevant complaints."  (*United States v. Millenium Laboratories, Inc.* (1st Cir. 2019) 923 F.3d 240, 253 (*Millenium Laboratories*).)  "The first-to-file bar is designed to be quickly and easily determinable, simply requiring a side-by-side comparison of the complaints."  (*In re Natural Gas Royalties Qui Tam Litigation* (10th Cir. 2009) 566 F.3d 956, 964.)  Judicial notice may be appropriate in certain cases.  (See, e.g., *Millenium Laboratories*, *supra*, 923 F.3d at pp. 244-245, fn. 2 [court took judicial notice of the government's complaint in intervention and the subsequent settlement agreement between the government and the defendant].)  Generally, however, courts should "look[] at the facts as they existed at the time [the second action] was brought."  (*Grynberg v. Koch Gateway Pipeline Co.* (10th Cir. 2004) 390 F.3d 1276, 1279.)

Here, defendants request judicial notice of an opposition to an anti-SLAPP motion and supporting evidence that Allstate filed in its action eight months after State Farm's complaint.  They intend to use these documents to show Allstate's action encompasses the fraud alleged in State Farm's complaint.  As explained below, in determining whether the two complaints allege the same fraudulent scheme, our analysis focuses on whether the initial complaint (Allstate's) provided the government with sufficient information to investigate the fraud alleged in the subsequent complaint (State Farm's).  (*United States ex rel. Batiste v. SLM Corp.* (D.C. Cir. 2011) 659 F.3d 1204, 1209 (*Batiste*).)  Consequently, this portion of our analysis focuses on the information already available to the government when State Farm filed its complaint.  Allstate filed

11

the relevant documents months after State Farm filed its action, and it does not appear any of these documents were ever provided to the government. As such, they are not relevant to our analysis, and we deny defendants' request for judicial notice.

*B. Applicable Law*

As described above, the IFPA's first-to-file rule generally prevents a party from bringing an action that is related to an already pending lawsuit. (§ 1871.7, subd. (e)(5).) "[A] 'related action' as an action that is based on the facts underlying the pending section 1871.7 action." (*State of California ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 419-420 (*Metz*).) Related does not mean identical. A subsequent lawsuit is barred even if it alleges new details regarding the fraud asserted in the pending lawsuit. (*Ibid*.)

Only one California case, *Metz*, has interpreted the IFPA's first-to-file rule. In *Metz*, the plaintiff suffered a car accident and submitted a claim to his auto insurer. (*Metz*, *supra*, 149 Cal.App.4th at p. 406.) His insurer deemed the car a total loss. To calculate the plaintiff's payout, the insurer received total loss valuations for the car from three providers: Creative Automotive Consultants (Creative), B.I.D. Enterprises, Inc. (B.I.D.), and CCC Information Services, Inc. (CCC). The plaintiff eventually settled the claim with his insurer based on these valuations. (*Id*. at pp. 409-410.) He later filed an IFPA action alleging his insurer had relied on false valuations from all three providers, which unfairly reduced the value of his claim. Creative and B.I.D. were named as defendants, but CCC was not. (*Id*. at pp. 407-408.) Nearly two years later, the plaintiff filed a separate lawsuit against CCC alleging it had provided his insurer with a false valuation. (*Id*. at p. 408.) While the plaintiff's second lawsuit was based on the same insurance claim as the initial suit, it provided additional allegations explaining the falsity of CCC's valuation. (*Id*. at pp. 410-411.)

12

The court sustained CCC's demurrer based on the statute of limitations and the first-to-file rule. As to the latter theory, the court explained the two actions were based on the same facts: "Indeed, although [the plaintiff] did not name CCC as a defendant in the [first] action, he alleged that CCC participated in making the same valuations that he contends were fraudulent . . . for purposes of both . . . actions. Neither the fact that CCC was not a named party to the prior action nor the presence in the subsequent action of additional allegations concerning CCC serves to make the prior action any less related. Those additional allegations all arose out of the facts of the prior action." (*Metz*, *supra*, 149 Cal.App.4th at p. 420.)

Though helpful, *Metz's* analysis of the IFPA's first-to-file rule is limited. The opinion primarily discusses the statute of limitations, devoting only about a page of discussion to the first-to-file rule. (See *Metz*, *supra*, 149 Cal.App.4th at pp. 415-20.) Further, in *Metz* it was apparent both actions involved the same fraud. Both lawsuits involved the same insurance transaction, and both complaints alleged CCC had provided a false valuation for the same car. Here, the relatedness of the two complaints is not so apparent. This case requires a deeper look at the IFPA's first-to-file rule, reviewing its underlying policy and purpose as well as analogous statutory schemes.

### 1. The Federal False Claims Act's First-to-File Rule

Since there is limited California authority interpreting the IFPA's first-to-file rule, we look to other statutory schemes for guidance. Namely, cases interpreting a similarly worded first-to-file rule within the federal False Claims Act (FCA; 31 U.S.C. § 3729, et seq.). Section 1871.7 was modeled after the California False Claims Act (*State ex rel. Wilson v. Superior Court* (2014) 227 Cal.App.4th 579, 596), which was "[p]atterned after the federal False Claims Act . . . ." (*State ex rel. Bartlett v. Miller* (2016) 243 Cal.App.4th 1398, 1405-1406.) The IFPA, California False Claims Act, and FCA all contain first-to-file rules, and the FCA's rule is substantially similar to the

IFPA's:  "When a person brings an action under [the FCA], no person other than the Government *may intervene or bring a related action based on the facts underlying the pending action*." [5]  (31 U.S.C. § 3730, subd. (b)(5), italics added.)

Further, the IFPA and FCA share a similar design and purpose.  They are qui tam statutes designed to supplement government enforcement to uncover and prosecute fraudulent claims.  (*United States v. Northrop Corp.* (9th Cir. 1995) 59 F.3d 953, 963; *State ex rel. Wilson v. Superior Court*, *supra*, 227 Cal.App.4th at p. 596.)  While the IFPA focuses on insurance fraud, the FCA targets fraud perpetrated against the federal government.  (*Stoner v. Santa Clara County Office of Education* (9th Cir. 2007) 502 F.3d 1116, 1126.)  Both statutes provide the government the opportunity to take over the lawsuit shortly after it is filed.  Under each, a complaint must be filed under seal for 60 days and served on the government.  The complaint cannot be served on the defendant until ordered by the court, presumably to allow the government sufficient time to decide whether to intervene.  (See 31 U.S.C. § 3730, subd. (b)(2); § 1871.7, subd. (e)(2); *Strathmann*, *supra*, 210 Cal.App.4th at p. 500; *United States ex rel., Sequoia Orange Co. v. Baird-Neece Packing Corp.* (9th Cir. 1998) 151 F.3d 1139, 1143.)  Given the relatedness of these statutes, it is appropriate here to consider authority construing the FCA's first-to-file rule.  (See *San Francisco Unified School Dist. ex rel. Contreras v. Laidlaw Transit, Inc.* (2010) 182 Cal.App.4th 438, 446.)

The FCA's first-to-file "rule is 'part of the larger balancing act of the FCA's qui tam provision, which "attempts to reconcile two conflicting goals, specifically, preventing opportunistic suits, on the one hand, while encouraging citizens to act as

---

[5]  Similarly, the California False Claims Act's first-to-file rule provides that "[w]hen a person brings an action under this subdivision, no other person may bring a related action based on the facts underlying the pending action."  (Gov. Code, § 12652, subd. (c)(10).)  As with the IFPA, there are few cases interpreting the California False Claims Act's first-to-file rule, and we are not aware of any material to this appeal.

whistleblowers, on the other."'" (*Millenium Laboratories*, *supra*, 923 F.3d at p. 252.) All federal circuits that have interpreted the rule apply the same standard. A subsequent action is barred if it "alleg[es] the same material elements of fraud described in an earlier suit, regardless of whether the allegations incorporate somewhat different details." (*United States ex rel. Lujan v. Hughes Aircraft Co.* (9th Cir. 2001) 243 F.3d 1181, 1189.) Some circuits apply the same standard but use the term "'essential facts'" instead of "'material elements of fraud.'"[6] (See, e.g., *United States ex rel. Duxbury v. Ortho Biotech Products, L.P.* (1st Cir. 2009) 579 F.3d 13, 32.)

The FCA's standard is applied by comparing the two complaints. "[I]f the first-filed complaint contains enough material information (the essential facts) about the potential fraud, the government has sufficient notice to launch its investigation. At that point, the purpose of the qui tam action under [the FCA] is satisfied. If a later-filed action, filed while the first one is pending, offers merely additional facts and details about the same scheme, the later-filed action will be barred because it is duplicative of the first suit. The reason for allowing private persons to bring qui tam actions is to reduce fraud against the government. A later-filed complaint that mirrors the essential facts as the pending earlier-filed complaint does nothing to help reduce fraud of which the government is already aware." (*United States ex rel. Heineman-Guta v. Guidant Corp.*

---

[6] Along with the First and Ninth Circuits, the Second, Third, Fourth, Fifth, Sixth, Seventh, Tenth, and D.C. Circuits have adopted the same standard. (*United States ex rel. Wood v. Allergan, Inc.* (2d Cir. 2018) 899 F.3d 163, 169; *United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.* (3d Cir. 1998) 149 F.3d 227, 232-233; *United States ex rel. Carson v. Manor Care, Incorp.* (4th Cir. 2017) 851 F.3d 293, 302; *United States ex rel. Branch Consultants v. Allstate Ins. Co.* (5th Cir. 2009) 560 F.3d 371, 378; *Walburn v. Lockheed Martin Corp.* (6th Cir. 2005) 431 F.3d 966, 971; *United States ex rel. Chovanec v. Apria Healthcare Group Inc.* (7th Cir. 2010) 606 F.3d 361, 363; *Grynberg v. Koch Gateway Pipeline Co.* (10th Cir. 2004) 390 F.3d 1276, 1279; *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.* (D.C. Cir. 2003) 318 F.3d 214, 217.) It appears the Eighth and Eleventh Circuits have not yet construed the FCA's first-to-file rule.

(1st Cir. 2013) 718 F.3d 28, 35-36 (*Heineman-Guta*).) "The first-filed claim provides the government notice of the essential facts of an alleged fraud, while the first-to-file bar stops repetitive claims." (*United States ex rel. Lujan v. Hughes Aircraft Co.*, *supra*, 243 F.3d at p. 1187.)

Still, under the FCA's first-to-file rule, "[i]t is not enough that [FCA] claims be related in the loose sense that they arise out of the same general kind of wrongdoing . . . ." (*United States ex rel. Chovanec v. Apria Healthcare Group Inc.*, *supra*, 606 F.3d at p. 363.) The FCA's rule does not apply if the two actions "allege different frauds with different mechanisms." (*Millenium Laboratories, Inc.*, *supra*, 923 F.3d at p. 253.) The complaints must share facts in common to trigger application of the FCA's first-to-file rule. (*United States ex rel. Chovanec*, at p. 363.) The initial complaint must also contain enough specificity to properly inform the government of the fraudulent scheme alleged. It has to provide "the essential facts to give the government sufficient notice to initiate an investigation into [the] allegedly fraudulent practices." (*Heineman-Guta*, *supra*, 718 F.3d at pp. 36-37.) "In other words, [the court] must determine whether the [second action] alleges a fraudulent scheme the government already would be equipped to investigate based on the [initial action]." (*Batiste*, *supra*, 659 F.3d at p. 1209.)

### 2. Distinctions Between the FCA and IFPA

While interpretations of the FCA's first-to-file rule are instructive, there are material differences between the IFPA and FCA we must consider. Notably, an FCA claim involves a single victim – the federal government. "The goal of the [FCA] is to recoup *government* funds lost through the fraud of federal contractors. In other words, when a federal contractor fraudulently overcharges the government, public monies are lost. The federal government is the [only] direct victim. . . . The relator recovers a bounty for bringing the fraud to light. If a federal contractor's fraud on the federal

16

government were the subject of multiple Federal False Claims Act proceedings, the amount of money recovered by the government would be diminished." (*Weitzman*, *supra*, 107 Cal.App.4th at p. 561.)

The IFPA seeks to prevent insurance fraud. Insurers, not the federal government, are the direct victims of the fraud. Unlike an FCA claim, the same fraudulent insurance scheme can have numerous direct victims. (*Weitzman*, *supra*, 107 Cal.App.4th at pp. 561-562.) And, generally, many of those victims will be unknown to the party filing the initial IFPA action since the scope of the defendant's fraudulent scheme will likely be unclear when the action is filed. In contrast, the direct victim in an FCA action will always be clear from the start—the federal government. Significantly, while multiple FCA proceedings reduce the amount of funds recovered by the government, "for each such successful prosecution [of an IFPA claim] by an insurer-relator, the government recovers *more*, not less, money." (*Id.* at p. 562, italics added.)

*3. Analytical Framework for the IFPA's First-to-File Rule*

Relying on case law construing the FCA's first-to-file rule, defendants and State Farm both assert the only relevant inquiry is whether the State Farm and Allstate complaints allege the same fraud. Allstate, however, filed an amicus brief arguing the first-to-file rule does not apply here because the two complaints involve different pools of victims. Allstate only seeks IFPA penalties for the false insurance claims involving *its* insureds. And although State Farm seeks penalties for the false claims involving *all* insureds, Allstate appears to suggest State Farm can only pursue penalties for the false claims involving its own insureds; it cannot seek penalties for the false claims that defendants submitted to any other insurer.[7] Allstate concludes that since "the two

---

[7] It is unclear whether Allstate intended to make this argument or whether it misinterpreted the scope of State Farm's complaint. Nonetheless, this issue is relevant to our analysis and was addressed by the parties at oral argument.

complaints involve different fraud victims and distinct claim populations each giving rise to distinct liability, '[t]he alleged frauds . . . exist completely independent of one another.'" (Quoting *United States ex rel. Hartpence v. Kinetic Concepts, Inc.* (9th Cir. 2015) 792 F.3d 1121, 1131.)

State Farm and defendants disagree with Allstate. Both sides believe it is irrelevant whether the two complaints involve different victims, and State Farm contends it can seek penalties for all the false claims that defendants submitted to any insurer. While an appellate court will generally not consider new issues raised in an amicus brief, this rule is not absolute. An appellate court has discretion to consider legal issues raised in amicus briefs that concern important policy issues. (*Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496, 502-503.) We exercise that discretion here. First, the relevant issues are legal, not factual. Second, given the lack of cases interpreting the IFPA's first-to-file rule, this decision involves an important issue of policy. Third, the relevant issues have been adequately addressed by the parties. State Farm and defendants filed written responses to the amicus brief and addressed the pertinent issues at oral argument.

As explained in this section, we adopt a standard that is partially based on the FCA's first-to-file rule but also accounts for the differences between the FCA and IFPA. The FCA's material facts test focuses on whether the two complaints allege a common fraudulent scheme; the identity of the direct victim is immaterial. But, as discussed below, the identity of the insurer-victims underlying an IFPA action is material. A nonparasitic IFPA action that alleges the same fraud as a pending suit is not barred if it seeks penalties based on a distinct victim pool. Thus, under the IFPA's first-to-file rule, a court must determine – in any order – whether the two complaints (1) seek penalties based on distinct victim pools, and (2) allege the same fraud.

To start, contrary to Allstate's suggestion, an insurer-relator can pursue IFPA penalties for all the false insurance claims submitted to any insurer that are part of

18

the same fraud. Nothing in the statute suggests an insurer-relator can only pursue penalties for the false claims involving its own insureds. Indeed, a relator can bring a qui tam action under the IFPA even if it has not suffered an injury. (*People ex rel. Alzayat v. Hebb*, *supra*, 18 Cal.App.5th at p. 831.) As such, it stands to reason an insurer can bring a broad IFPA action covering all the false claims a defendant has billed to any insurer. Besides, limiting insurers to IFPA actions involving their own insureds would subvert the IFPA's goal of fighting insurance fraud. Such a rule would arbitrarily limit the scope of IFPA actions, likely reducing the total amount of penalties recovered against a defendant.[8] (See *Weitzman*, *supra*,107 Cal.App.4th at pp. 561-562.)

Whether to pursue a narrow or broad IFPA action is within the discretion of the relator. Nothing in the text of section 1871.7 requires a relator to pursue penalties for *all* the false insurance claims a defendant billed to *all* the insurer-victims under the same fraud. The statute does not mandate an all or nothing approach. And we see no reason to conclude an insurer (or any relator) cannot pursue IFPA penalties for only the false insurance claims billed to a subset of victims.

As a matter of policy, relators should be allowed to control the scope and risk of their IFPA lawsuits. The enticement of a bigger bounty will certainly encourage many relators to pursue broad IFPA actions covering all the false claims within the same scheme. Still, some relators (such as smaller insurers) may not want to undertake the expense and risk of a large-scale IFPA action, especially since the full scope of a fraudulent scheme may be unclear when an IFPA action is first filed. When weighing these variables, a relator may reasonably desire to pursue a limited IFPA action that is less expensive, involves clearly defined direct victims, and carries reduced risk. Indeed, narrow IFPA actions do not appear uncommon. (See, e.g., *People ex rel. Government*

---

[8] Among other things, the IFPA's public disclosure rule would likely prevent other insurers from filing subsequent lawsuits using information made public by the initial complaint. (§ 1871.7, subd. (h)(2)(A).)

*Employees Ins. Co. v. Cruz* (2016) 244 Cal.App.4th 1184, 1187-1188, fn. 7 [insurer filed an IFPA action covering only the false claims involving its insureds].) In contrast, requiring relators to seek broad relief might discourage some from filing an IFPA action to avoid the expense and/or risk of a large-scale lawsuit. This would interfere with the IFPA's purpose of uncovering and deterring insurance fraud. (See *id*. at p. 1192.)

Next, we conclude a nonparasitic IFPA action that alleges the same fraud as a pending action is not barred if it seeks penalties based on a separate pool of victims. This departure from the FCA is necessary due to the distinctions between the IFPA and FCA. The identity of the victim is not a material fact under the FCA's first-to-file rule. An FCA action always seeks to "recover funds fraudulently obtained directly from the government. In FCA cases, the government itself is the direct, and only, victim." (*California v. AbbVie Inc.* (N.D. Cal. 2019) 390 F.Supp.3d 1176, 1180.) Allowing multiple FCA actions for the same fraud and same direct victim *reduces* the total amount of money recovered by the government. (*Weitzman*, *supra*, 107 Cal.App.4th at pp. 561-562.)

In contrast, an insurance fraud scheme typically involves numerous direct victims; specifically, the defrauded insurers. And unlike an FCA action, an IFPA relator can seek penalties based on the false claims a defendant billed to a single insurer, to a limited group of insurers, or to all insurers. The identity of the specific victims underlying a relator's request for penalties is material in an IFPA action. IFPA penalties are intended to be remedial and aimed towards "disgorging unlawful profit, restitution, compensating the state for the costs of investigation and prosecution, and alleviating the social costs of increased insurance rates due to fraud." (§ 1871.7, subd. (c).) But due to the discretion afforded them, an IFPA relator may not seek full remediation for all the direct victims that were defrauded under the same scheme. Allowing nonparasitic lawsuits based on separate victim pools will benefit the government "in terms of fraud prevention and financially." (See *Weitzman*, *supra*, 107 Cal.App.4th at p. 562.) Unlike

the FCA, the government recovers *more* money "for each . . . successful prosecution by an insurer-relator." (*Ibid*.) The additional funds recovered from such lawsuits will assist the government's efforts in fighting insurance fraud. Moreover, if a relator chose to file a narrow IFPA action, it would create an unreasonable windfall for the orchestrators of the fraud. They would be protected from further nonparasitic lawsuits, allowing them to unfairly evade payment of additional restitution for their fraudulent scheme.

To be clear, the scope of the initial IFPA action determines whether any additional, nonparasitic lawsuits may be brought based on the same fraud. If the victim pool at issue in a later-filed IFPA lawsuit is completely subsumed by a prior IFPA lawsuit, it is barred. The later-filed suit may only proceed if it seeks penalties based on victim-insurers that were not covered by the first lawsuit and if it is not barred by any other rule, such as the public disclosure rule (§ 1871.7, subd. (h)(2)(A)).

In addition to determining whether two IFPA complaints cover distinct victims, courts must also evaluate whether they allege the same fraudulent scheme. When two IFPA relators file complaints alleging the same fraud and the same victims, the subsequent suit unfairly shares in the bounty. It adds no extra remedial benefit and does nothing to reduce insurance fraud. Nor does it disgorge any additional unlawful profit. Accordingly, the standard applied for the FCA's first-to-file rule is relevant to this portion of the IFPA analysis: we determine whether the allegations in the first complaint provided sufficient notice for the government to investigate the fraud alleged in the subsequent complaint. (See *Millenium Laboratories*, *supra*, 923 F.3d at pp. 252-253; *Heineman-Guta*, *supra*, 718 F.3d at pp. 35-36; *Batiste*, *supra*, 659 F.3d at pp. 1209-1210.) The adoption of this standard is warranted given the similarities between the statutes discussed above.

We recognize this analytical framework risks creating piecemeal IFPA litigation, in which multiple suits are pending against the same defendant for the same fraud based on different victim pools. This risk is mitigated by several factors. First, the

21

financial incentive of a large bounty will encourage relators to bring broad IFPA actions. Second, the IFPA's public disclosure rule precludes parasitic IFPA actions. (§ 1871.7, subd. (h)(2)(A); *Weitzman*, *supra*, 107 Cal.App.4th at p. 564.) Third, if necessary, the State can intervene, take over separate lawsuits, and consolidate or coordinate them. (See *State ex rel. Aetna Health of California, Inc. v. Pain Management Specialist Medical Group* (2020) 58 Cal.App.5th 1064, 1070.) Similarly, if an initial IFPA action seeks penalties based on an overly narrow group of insurer-victims, the government may intervene to enlarge the scope of the action. Finally, in the event multiple lawsuits are pending involving the same fraud but different victims, we trust our trial courts can coordinate proceedings and transfer cases as necessary to avoid or reduce any inefficiencies.

## C. Analysis

### 1. Victim Pools

The two complaints primarily involve separate victim pools. Allstate only seeks penalties for the false insurance claims that defendants presented to Allstate, while State Farm seeks penalties for all the false claims that defendants billed to any insurer. Though the only overlapping victim is Allstate, we must still examine whether the two complaints allege the same fraud. Before doing so, however, we first clarify the scope of this inquiry. Since the two complaints only share one common victim, even if we find below that they allege the same fraud, State Farm would only be barred from pursuing IFPA penalties for the false claims involving Allstate's insureds. In this scenario, it would not be precluded from pursuing penalties for the false claims presented to any other insurer. Conversely, if we find the two complaints do not allege the same fraud, State Farm may pursue its IFPA action without limitation.

### 2. Fraudulent Scheme

The relevant question is "whether [State Farm's complaint] allege[d] a fraudulent scheme the government [was] already . . . equipped to investigate based on [Allstate's complaint]." (*Batiste*, *supra*, 659 F.3d at p. 1209.) Allstate's complaint must contain "enough material facts to alert the government" of the fraudulent scheme alleged in State Farm's complaint. (*Heineman-Guta*, *supra*, 718 F.3d at pp. 37-38.) If so, it is immaterial whether State Farm's complaint "incorporate[ed] additional or 'somewhat different details.'" (*Ibid*.)

Allstate's complaint informed the relevant government agencies that defendants were perpetrating a medical billing fraud involving epidural spinal injections and the manipulation of billing codes. The introduction of the complaint describes the alleged scheme. It states Dr. Rubin "routinely recommend[ed] predetermined 'one-size-fits-all' treatment plans without regard to medical necessity or patient safety, to fraudulently increase the value of the patients' claims and to maximize his own revenue, profit, and income." In furtherance of this scheme, defendants "prepared bills for treatment and procedures represented to have been rendered by [Dr. Rubin]," which contained false statements about the "nature of services allegedly provided, the cost of such services, and the location of where services were provided." The introduction then explains in part how this scheme was accomplished: "[t]hrough the manipulation of billing codes to maximize reimbursement, bills submitted by [defendants] grossly inflate[d] the value of the services rendered and often contain[ed] charges for treatment that was never provided or multiple charges for the same treatment."

Allstate's complaint provides further details in paragraphs 38 and 40. These paragraphs specify that Dr. Rubin's one-size-fits-all treatment plans included "repeated epidural steroid injections . . . , which were billed at exorbitant rates." They also allege Dr. Rubin recommended "epidural steroid injections, without regard to medical necessity or patient safety, knowing that such recommendations would

23

fraudulently inflate the value of the patient's claim." Paragraph 43 then explains that Dr. Rubin's entities "falsified billing statements and invoices regarding the services purportedly rendered, through the fraudulent manipulation of billing codes with the intent to maximize the reimbursement value of the treatment." These fraudulent practices included "'unbundling' [CPT] codes, billing for treatment not rendered, and double billing when only one service was provided." (Fn. omitted.)

Similarly, State Farm alleges Dr. Rubin engaged in a fraudulent scheme concerning epidural spinal injections. Generally, Dr. Rubin manipulated billing codes to improperly bill for services performed in connection with these injections. State Farm's complaint intricately explains how defendants improperly unbundled CPT codes for fluoroscopic imaging and for separate evaluation and management services that were not warranted. They also billed for epidurography and myelography procedures that were either not performed or not medically necessary. Importantly, these four services were all falsely billed by defendants solely in connection with epidural steroid injections.

As to these four services (fluoroscopy, epidurography, myelography, and evaluation and management services), the fraud alleged by State Farm was already alleged in Allstate's complaint. The two complaints involve the same timeframe and allege a scheme in which defendants defrauded insurers by inflating bills related to epidural steroid injections. Both also allege the fraud involved unbundling CPT codes, double billing, and billing for services that were never rendered. Allstate's complaint is broader, as it covers other types of procedures such as facet blocks that were part of defendants' alleged "one-size-fits-all" treatment regimen. And State Farm's complaint is more granular in describing how defendants specifically defrauded insurers when billing for epidural spinal injections. But these differences are immaterial here. (See *Heineman-Guta*, *supra*, 718 F.3d at pp. 35-36; *United States ex rel. Ven-A-Care of The Florida Keys, Inc. v. Baxter Healthcare Corp.* (1st Cir. 2014) 772 F.3d 932, 941-942.) Allstate's complaint provided the government with sufficient notice to investigate Dr. Rubin's

24

allegedly fraudulent practices for epidural steroid injections, which was the focus State Farm's complaint.

Aside from the four services identified above, State Farm also alleges Dr. Rubin and Rubin, Inc., falsely billed for MRI interpretations. Unlike the other four services, these MRI charges were largely billed as an independent service, unconnected with any other procedure. Though a handful of the MRI charges were billed in connection with epidural steroid injections, the vast majority were not. And nothing in Allstate's complaint suggests State Farm's MRI allegations share any essential facts with the "one-size-fits-all" treatment plan alleged by Allstate. At most, Allstate's complaint provided sufficient notice for the government to investigate a fraction of the allegedly fraudulent MRI charges – those that Dr. Rubin billed in connection with epidural steroid injections. But nothing in its complaint suggests it prepared the government to investigate any independently billed MRI charges. As to these charges, sufficient notice was not provided. As such, we conclude Allstate's complaint has no bearing on State Farm's ability to pursue penalties for the allegedly false MRI charges that were not billed in connection with epidural steroid injections.

The Insurance Commissioner (the real party in interest) filed a statement of interest in support of State Farm, in which it contends "the Allstate complaint did not put the Commissioner on notice of the fraud alleged in [State Farm's] complaint." Likewise, it maintains that "without the benefit of [State Farm's] complaint, [it] could have discovered the fraud alleged by [State Farm] only through an intensive and resource-consuming investigation.[9] While we give some consideration to the Commissioner's position, the ultimate responsibility for interpreting the first-to-file rule rests with the court. (*Tower Lane Properties v. City of Los Angeles* (2014) 224 Cal.App.4th 262, 276.)

---

[9] We requested supplemental briefing as to how much deference and weight we should give to the Insurance Commissioner's opinion. Both State Farm and defendants submitted supplemental briefs in response.

25

The Insurance Commissioner's argument does not discuss the significance of the separate victim pools alleged in the two complaints. Thus, it has no bearing on that portion of our analysis. As to whether the two complaints allege the same fraud, we agree Allstate's complaint did not put the Commissioner on notice of the independent MRI charges alleged in State Farm's complaint. As to the remainder of State Farm's complaint, we also agree it provides greater detail about defendants' scheme involving epidural steroid injections. State Farm's complaint likely would have aided the Insurance Commissioner in investigating this fraud. But that is not the standard. State Farm's allegations regarding defendants' epidural-spinal-injection scheme overlap with the fraudulent scheme alleged in Allstate's complaint. The additional details provided in State Farm's complaint are immaterial. (*United States ex rel. Ven-A-Care of The Florida Keys, Inc. v. Baxter Healthcare Corp.*, *supra*, 772 F.3d at pp. 941-942.)

Further, there is no evidence the Insurance Commissioner ever attempted to investigate Allstate's claims. Nor is there any evidence of the steps the Commissioner would have taken had it commenced such an investigation. Based on the record, it is entirely speculative as to what information the Commissioner would have discovered had it investigated the fraud alleged by Allstate and how long it would have taken to discover such information. The IFPA's first-to-file rule "asks about what is related to the 'facts underlying the pending action.' It does not make anything turn on whether the [government] puts those facts to their best use." (*United States ex rel. Chovanec v. Apria Healthcare Group Inc.*, *supra*, 606 F.3d at p. 365.)

In summary, as to the portion of State Farm's IFPA action relating to fluoroscopy, epidurography, myelography, evaluation and management services, and the MRI charges billed in connection with epidural spinal injections, State Farm may pursue penalties for the false claims that defendants presented to any insurer except Allstate. As to the remaining MRI charges, State Farm may pursue penalties for those charges that defendants billed to any insurer, including Allstate, that were not billed in connection

26

with an epidural spinal injection.  Given these findings, defendants' demurrer did not entirely dispose of either of State Farm's IFPA causes of action and should have been overruled.  (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 119.)


## III

## DISPOSITION

The judgment is reversed.  On remand, the court is instructed to overrule defendants' demurrer.  The parties shall bear their own costs on this appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.


27